216 F.3d 1357 (Fed. Cir. 2000)
 GOSS GRAPHICS SYSTEMS, INC., Plaintiff,
v.
UNITED STATES, Defendant.
MITSUBISHI HEAVY INDUSTRIES, LTD., Plaintiff-Appellant,
and
MAN ROLAND DRUCKMASCHINEN AG and MAN ROLAND INC., Plaintiffs-Appellants,
and
KBA-MOTTER CORPORATION and KOENIG & BAUER-ALBERT AG, Plaintiffs-Appellants,
and
TOKYO KIKAI SEISAKUSHO, LTD., Plaintiff,
v.
UNITED STATES, Defendant-Appellee,
and
GOSS GRAPHICS SYSTEMS, INC. Defendant-Appellee.
 99-1150, 99-1151, 99-1152
 UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT
 June 20, 2000
Rehearing En Banc Denied August 29, 2000
 
 Richard O. Cunningham, Steptoe & Johnson LLP, of Washington, DC, argued for plaintiff-appellant, Mitsubishi Heavy Industries, Ltd. With him as counsel on the brief were Edward J. Krauland and Maury D. Shenk. Of counsel was Veronica Moran Wetherill.
 Michael J. Chapman, Shearman & Sterling, of Washington, DC, argued for plaintiffs-appellants, MAN Roland Druckmaschinen AG and MAN Roland Inc. With him on the brief were Thomas B. Wilner, and Jeffrey M. Winton.
 Kenneth George Weigel and Laura Fraedrich, Kirkland & Ellis, of Washington, DC, of counsel on the brief for plaintiffs-appellants, KBA-Motter Corporation and Koenig & Bauer-Albert AG.
 Neal J. Reynolds, Attorney, Office of the General Counsel, U.S. International Trade Commission, of Washington, DC, argued for defendant-appellee, United States. With him on the brief were Lyn M. Schlitt, General Counsel; and James A. Toupin, Deputy General Counsel.
 Charles Owen Verrill, Jr., Wiley, Rein & Fielding, of Washington, DC, argued for defendant-appellee, Goss Graphics Systems, Inc. With him on the brief were Alan H. Price, and Timothy C. Brightbill. Of counsel were John R. Shane, and Eileen P. Bradner.
 Before LOURIE, RADER, and BRYSON, Circuit Judges.
 RADER, Circuit Judge.
 
 
 1
 The International Trade Commission (ITC) determined that imminent foreign imports of large newspaper printing presses (LNPPs) sold at less than fair value (LTFV) posed a threat of material injury to a domestic industry. See Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Germany and Japan, USITC Pub. 2988, 52, Inv. Nos. 731-TA-736 and 737 (Aug. 1996) (Final Determination). To make this determination, the ITC cumulated imports from Japan and Germany. See id. at 37. The Court of International Trade affirmed the ITC's final determination on cumulation and threat of material injury. See Goss Graphics Sys., Inc. v. United States, 33 F. Supp. 2d 1082, 1104 (Ct. Int'l Trade 1998). Because the ITC properly determined that Japanese and German imports overlapped, justifying cumulation, and the ITC did not commit legal error in determining that there was a threat of material injury to a domestic industry, this court affirms the judgment of the Court of International Trade in its entirety.
 
 BACKGROUND
 
 2
 LNPPs are highly sophisticated presses designed to print major newspapers. In operation, LNPPs produce tens of thousands of newspapers per hour. Newspaper companies order LNPPs to meet their individual specifications, which vary significantly. Contracts on LNPPs stretch over many months and specify terms of sale, delivery, design, construction, and installation. See Goss Graphics, 33 F. Supp. 2d at 1085. Under these circumstances, LNPPs "offered in different bid processes to different purchasers are not easily comparable to one another." Final Determination at 40.
 
 
 3
 The appellee, Goss Graphics Systems, Inc. (Goss), is the largest supplier of LNPPs in the U.S. market. See id. at 10, 23. Goss represents the domestic industry in this case. The appellants are Japanese and German LNPP producers including Mitsubishi Heavy Industries, Ltd., MAN Roland Druckmaschinen AG and MAN Roland Inc., and KBA-Motter Corporation and Koenig & Bauer-Albert AG. Ltd. (collectively, foreign producers).
 
 
 4
 The substantial cost and life expectancy of LNPPs contribute to a relatively small number of U.S. sales in a given year. See id. at 19. Beginning in 1992, the worldwide LNPP market experienced a dramatic decline. See International Trade Comm'n Staff Report, VI-7 (Aug. 6, 1996). In 1994, however, the worldwide LNPP market began "to demonstrate renewed strength following the[] worst recession in 50 years." Id. In June 1995, the domestic industry filed an antidumping petition against imports of LNPPs sold in the United States at LTFV by the foreign producers (hereinafter subject imports).
 
 
 5
 The ITC investigated whether the subject imports materially injured or posed a threat of material injury to the domestic industry[1] under 19 U.S.C. 1677(7)(F) (1994). During the investigation, the ITC examined a six-year period from 1991 to 1996 "to better assess conditions in the LNPP market and the nature of competition in that market." Final Determination at 19. As a threshold matter, the ITC cumulated imports from Japan and Germany in analyzing material injury and threat of material injury. See id. at 37, 47. According to the statute, "the Commission may cumulatively assess the volume and price effects of imports of the subject merchandise from all countries . . . if such imports compete with each other and with domestic like products in the United States market." 19 U.S.C. 1677(7)(G)(i), (H) (1994). In particular, the ITC determined that a "reasonable overlap" existed between the Japanese imports and German imports because they compete with each other and with domestic products in the U.S. market. See Final Determination at 32.
 
 
 6
 Based on the investigation of cumulated imports, the ITC concluded that the subject imports did not materially injure the domestic industry.[2] See id. at 46. In its analysis, the ITC noted: "the subject imports are having some adverse impact on the industry . . . [but] the full impact of the[] lost sales and market share is not yet fully reflected in the financial condition of the industry . . . . [Thus,] we conclude the adverse effect of the subject imports has not reached the level necessary for us to find material injury by reason of such imports." Id. at 45.
 
 
 7
 However, the ITC held that foreign imports pose a threat of material injury under 19 U.S.C. 1677(7)(F).[3] See id. at 47. Specifically, the ITC found that the subject imports satisfied the statutory requirement that "further dumped or subsidized imports are imminent and [that] material injury by reason of imports would occur unless an order is issued." See id. at 46. The full text of 1677(7)(F)(ii) states:
 
 
 8
 Basis for determination. The Commission shall consider the factors set forth in clause (i) as a whole in making a determination of whether further dumped or subsidized imports are imminent and whether material injury by reason of imports would occur unless an order is issued or a suspension agreement is accepted under this subtitle. The presence or absence of any factor which the Commission is required to consider under clause (i) shall not necessarily give decisive guidance with respect to the determination. Such a determination may not be made on the basis of mere conjecture or supposition.
 
 
 9
 In applying this statutory section, the ITC weighed the vulnerability of the domestic industry as an important factor. See id. at 48. For example, the ITC stated that the "small number of pending sales . . . will likely result in intense competition among domestic and foreign suppliers for bid awards." Id. at 50. The intensified competition, the ITC continued, would lead to price suppression, see id., and "significantly hamper the industry's ability to develop the advanced technologies necessary to stay competitive in [the LNPP] market," id. at 51. After considering the relevant statutory factors, the ITC found the subject imports posed a threat of material injury.
 
 
 10
 Foreign producers appealed the ITC's affirmative determination of threat of material injury to the Court of International Trade. The Court of International Trade affirmed the ITC's Final Determination in its entirety. See Goss Graphics, 33 F. Supp. 2d at 1104. Foreign producers appeal the cumulation determination and the affirmative finding of threat of material injury. Neither party appeals the determination of no material injury.
 
 DISCUSSION
 
 11
 This court reviews ITC's factual determinations by reapplying the Court of International Trade's standard of review. See Micron Tech., Inc. v. United States, 117 F.3d 1386, 1393 (Fed. Cir. 1997). Thus, as the Court of International Trade earlier examined, this court inquires whether the ITC's determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. 1516a(b)(1)(B)(i) (1994); see Suramerica de Aleaciones Laminadas v. United States, 44 F.3d 978, 983 (Fed. Cir. 1994). In the present case, this court first addresses the cumulation issue, then turns to the threat of material injury determination.
 
 I.
 
 12
 In injury determinations, 19 U.S.C. 1677(7)(G)(i) and (H) govern when the ITC "may cumulatively assess the volume and price effects of imports of the subject merchandise from all countries" for petitions filed on the same day. The statute permits the ITC to cumulate imports "if such imports compete with each other and with domestic like products in the United States market." 19 U.S.C. 1677(7)(G)(i), (H). The ITC's inquiry for a sufficient overlap of competition used a listing of ways to detect overlapping competition outlined in Fundicao Tupy, S.A. v. United States, 12 C.I.T. 6, 678 F. Supp. 898, 902 (Ct. Int'l Trade 1988), aff'd, 859 F.2d 915 (Fed. Cir. 1988). These ways include "the fungibility and similar quality of the imports, the similar channels of distribution, the similar time period involved, and the geographic overlap of the markets." 678 F. Supp. at 902. This court acknowledges that these ways help detect overlapping competition, though other ways may apply in future cases.
 
 
 13
 At the outset, the ITC noted that the "price competition in [the LNPP] market . . . occurs primarily during the extended and generally highly competitive bid/negotiation process, which can occur months and even years prior to the point at which any shipments are made." Final Determination at 33. From that foundation, the ITC proceeded to address the competition indicia from Fundicao.
 
 
 14
 First, the ITC found that the "subject imports from Germany and Japan and the domestic merchandise were generally sold in similar channels of trade since the large majority of German and Japanese subject imports and the domestic merchandise was sold directly by the manufacturer of the merchandise to the customer." Id. at 33-34. Second, the ITC determined that the subject imports from Germany and Japan simultaneously occupied the market during the same time frames with sales, offers to sell, and actual imports. See id. at 34. Foreign producers, the ITC observed, were "actively bidding for sales of press lines and additions in every year of the period examined." Id. Third, the ITC held that "German, Japanese and domestic producers are not limited by geographic boundaries with respect to their submission of bids and are therefore able to - and do - submit bids on LNPP projects throughout the nation." Id. at 34-35. On appeal, foreign producers do not challenge these three findings.
 
 
 15
 Rather, the sole basis for foreign producers' challenge to the ITC cumulation determination pivots on the fourth way of detecting overlapping competition - the fungibility of imports. In particular, foreign producers faulted the ITC's finding that German and Japanese producers competed head-to-head with each other in the final stage of the bidding process. Despite the lengthy bidding process of LNPPs, see id. at 22, record evidence in this case shows that "purchasers [of LNPPs] solicited detailed initial bids from both German and Japanese producers as well as domestic producers . . . [indicating] that purchasers perceived a reasonable degree of fungibility among various producers' presses at the initial bid stage." Id. at 35-36. Under these circumstances, whether a foreign producer makes it to the penultimate or ultimate round of the bidding process is not determinative of fungibility.
 
 
 16
 Moreover, as the ITC properly noted, no single indicator for weighing competitive overlap is dispositive. See id. at 32. Rather, the Fundicao indicators provide a guiding framework within which the ITC may weigh the evidence to inquire whether "reasonable overlap" of competition exists. Under this framework, the ITC properly concluded that the German imports competed with Japanese imports and domestic products within the meaning of the cumulation provision. Because the record provides sufficient evidence of overlap in the end-use market to justify cumulation, this court affirms the ITC's cumulation determination.
 
 II.
 
 17
 Title 19 imposes antidumping duties if the subject imports are sold, or are likely to be sold, in the United States at LTFV and those imports threaten to materially injure a domestic industry. See Micron Tech., 117 F.3d at 1393. For a threat determination, 1677(7)(F)(i) sets forth relevant economic factors the ITC must consider, including material injury caused by imports or sales for importation. Those factors guide the Commission to determine the imminence of further dumped imports and "whether material injury by reason of imports would occur unless an order is issued." 19 U.S.C. 1677(7)(F)(ii); see NEC Corp. v. Department of Commerce, 36 F. Supp. 2d 380, 392 (Ct. Int'l Trade 1998). An affirmative finding of threat of material injury requires substantial evidence on the entire record that the domestic industry faces a real threat of imminent material injury from the subject imports. See Suramerica de Aleaciones Laminadas, 44 F.3d at 983.
 
 
 18
 The next subsection, 1677(7)(F)(ii) entitled "Basis for determination," requires the ITC to "consider the factors set forth in clause (i) as a whole in making a determination of whether further dumped or subsidized imports are imminent and whether material injury by reason of imports would occur unless an order is issued." The statute thus requires a determination of a temporal relationship ("imminent") and a causal connection ("by reason of") between the LTFV imports and the threat of material injury. See NEC Corp., 36 F. Supp. 2d at 391 (citing Gerald Metals, Inc. v. United States, 132 F.3d 716, 720 (Fed. Cir. 1997)). "Such a determination may not be made on the basis of mere conjecture or supposition." 19 U.S.C. 1677(7)(F)(ii).
 
 
 19
 Consistent with the statutory mandate, the ITC began its threat determination by "considering whether the domestic industry is threatened with material injury by reason of the subject imports by taking into account whether 'further dumped or subsidized imports are imminent and whether material injury by reason of imports would occur unless an order is issued." Final Determination at 46. In making that determination, the ITC considered, "in addition to other relevant economic factors, all statutory factors that are relevant to these investigations." Id. at 47.
 
 
 20
 In particular, the ITC noted that the importers had obtained an increasing share of the contracts awarded during the final two years of the investigation and that a certain number of new sales, for which the importers were competing actively, were imminent. See id. at 49. Because the number of pending sales was small and the competition from the importers was active, the ITC found that the "intensified competition for a smaller pool of sales opportunities increases the incentive for suppliers of LTFV imports to compete on the basis of price," id. at 50, and that the importers' presence in the market would likely lead to price suppression and depression. Furthermore, the ITC found that the German producers would "continue to export subject merchandise to their related subsidiaries in order to help those companies maintain (or even increase) their presence in the [U.S.] market." Id. at 51.
 
 
 21
 Thus, the ITC's analysis specifically addressed several of the statutory factors set forth in 1677(7)(F)(i), finding that the importers could shift significant future production to the United States (factors II and VI); that importers had recently experienced a significant rate of increase of market penetration (factor III); that the presence of the importers in the bidding process "will likely result in price suppression and depression" (factor IV); and that "the continued entry of the subject imports into the market at LTFV prices is likely to have significant negative effects on existing production and development efforts of the domestic industry" (factor VIII). The ITC's analysis of these factors is set forth in more detail in the Final Determination, and the Court of International Trade, in its affirmance, analyzed it in considerable detail.
 
 
 22
 Therefore, this court holds that substantial evidence supports the ITC's findings that the domestic LNPP industry is threatened with material injury by reason of LTFV imports of German and Japanese LNPPs. Accordingly, this court affirms the judgment of the Court of International Trade upholding the ITC's affirmative threat determination.
 
 CONCLUSION
 
 23
 Because sufficient evidence of overlap in the end-use market justifies the ITC's cumulation of imports from Germany and Japan, this court affirms on the cumulation issue. Moreover, because substantial evidence supports the ITC's determination that further dumped imports pose a threat of material injury, this court upholds the affirmative determination of threat of material injury.
 
 COSTS
 
 24
 Each party shall bear its own costs.
 
 
 25
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 The statute requires the Commission to make a final determination of whether an industry in the United States is materially injured, or is threatened with material injury by reason of imports, or sales (or the likelihood of sales) for importation. See 19 U.S.C. 1673d(b)(1) (1994).
 
 
 [2]
 Section 1677(7)(A) of title 19 defines material injury as "harm which is not inconsequential, immaterial, or unimportant."
 
 
 [3]
 The text of 1677(7)(F)(i), in relevant part, is as follows:
 In determining whether an industry in the United States is threatened with material injury by reason of imports (or sales for importation) of the subject merchandise, the Commission shall consider, among other relevant economic factors--
 (I) if a countervailable subsidy is involved . . . and whether imports of the subject merchandise are likely to increase,
 (II) any existing unused production capacity or imminent, substantial increase in production capacity in the exporting country indicating the likelihood of substantially increased imports of the subject merchandise into the United States . . .
 (III) a significant rate of increase of the volume or market penetration of imports of the subject merchandise indicating the likelihood of substantially increased imports,
 (IV) whether imports of the subject merchandise are entering at prices that are likely to have a significant depressing or suppressing effect on domestic prices, and are likely to increase demand for further imports,
 (V) inventories of the subject merchandise,
 (VI) the potential for product-shifting . . .
 * *
 (VIII) the actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and
 (IX) any other demonstrable adverse trends that indicate the probability that there is likely to be material injury by reason of imports (or sale for importation) of the subject merchandise (whether or not it is actually being imported at the time).
 19 U.S.C. 1677(7)(F)(i) (1994).