**Slip Op. 02-79**

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  RICHARD W. GOLDBERG, SENIOR JUDGE**

|  |  |
|---|---|
| UGINE-SAVOIE IMPHY, UGINE STAINLESS AND ALLOYS, INC., and TECHALLOY, INC., <br><br> Plaintiffs, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, <br><br> Defendant, <br><br> and <br><br> CARPENTER TECHNOLOGY, EMPIRE SPECIALTY STEEL, UNITED STEEL WORKERS OF AMERICA (AFL-CIO/CLC), <br><br> Defendant-Intervenors. | **PUBLIC VERSION** <br><br> Court No. 00-08-00423 |

[ITC sunset review determination to continue antidumping duty orders is sustained.]

Dated: July 31, 2002

Weil Gotshal & Manges, LLP (Stuart M. Rosen, Gregory Husisian, and John M. Ryan) for plaintiffs, Ugine-Savoie Imphy, Ugine Stainless and Alloys, Inc., and Techalloy, Inc.

Lyn M. Schlitt, General Counsel, Mark A. Bernstein, Acting Assistant General Counsel, U.S. International Trade Commission (Michael K. Haldenstein), for defendant.

Collier Shannon Scott, PLLC, (David A. Hartquist, Laurence J. Lasoff, Robin H. Gilbert, Mary T. Staley, and John M. Herrmann) for defendant-intervenors Carpenter Technology, Empire Specialty Steel, and United Steel Workers of America (AFL-CIO/CLC).

## OPINION

**GOLDBERG, Senior Judge:** Plaintiffs appeal the United States International Trade Commission's (the "Commission") five-year sunset review determination that revocation of the antidumping duty order on stainless steel wire rod ("wire rod") from France would likely lead to the continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time. See Notice: Stainless Steel Wire Rod From Brazil, France, India, and Spain, 65 Fed. Reg. 45,409 (July 21, 2000); Stainless Steel Wire Rod From Brazil, France, India, and Spain, USITC Pub. 3321, Inv. Nos. 701-TA-178 (Review) and 731-TA-636-638 (Review) (July 26, 2000) ("Sunset Review"). Plaintiffs are Ugine-Savoie Imphy ("U-SI"), a French manufacturer of wire rod, and Ugine Stainless and Alloys, Inc. ("US&A") and Techalloy, Inc. ("Techalloy"), U.S. affiliates of U-SI and importers of wire rod. Carpenter Technology, Empire Specialty Steel, and United Steel Workers of America (AFL-CIO/CLC) participated as defendant-intervenors in this action.

This court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000).

## I.   Standard of Review

The Court will uphold the Commission's determination in a sunset review unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19

U.S.C. § 1516a(b)(1)(B)(i) (2000); see also Goss Graphics

Systems, Inc. v. United States, 216 F.3d 1357 (Fed. Cir. 2000).

**II. Background**

A. Overview of the Sunset Review Statutory Provisions

The Commission and the International Trade Administration

("ITA") are required to conduct sunset reviews five years after

publication of a duty order or a prior sunset review. See 19

U.S.C. § 1675(c)(1)(2000). In a sunset review of an antidumping

duty order, the Commission determines "whether revocation of an

order . . . would be likely to lead to continuation or recurrence

of material injury within a reasonably foreseeable time." 19

U.S.C. § 1675a(a)(1) (2000). To determine the likelihood of

material injury, the Commission shall consider the likely (1)

volume, (2) price effect, and (3) impact of the subject imports

on the domestic industry if the order were revoked. Id.

Before the Commission analyzes the likely volume, price

effect, and impact, the Commission determines whether to

cumulatively assess the volume and effect of subject imports from

all countries for which sunset reviews were initiated on the same

day. 19 U.S.C. § 1675a(a)(7). The statute authorizes cumulation

if the Commission determines that the countries' subject imports

would likely compete with each other and with the domestic like

product. See id. There is an express exception prohibiting

cumulation if the Commission determines that the subject imports

are "likely to have no discernible adverse impact on the domestic

industry." Id. While the above limitations prevent cumulation

in certain circumstances, in all other instances cumulation is

discretionary, not mandatory. See 19 U.S.C. § 1675(a)(7) ("the

Commission may cumulatively assess the volume and effect . . .")

(emphasis added).

After determining whether to cumulate, the Commission

analyzes the volume, price effect, and impact of subject imports

on the domestic industry. With respect to the first factor,

volume, the Commission shall consider whether the likely volume

of subject imports "would be significant if the order is revoked

. . . either in absolute terms or relative to production or

consumption in the United States." 19 U.S.C. § 1675a(a)(2). For

purposes of determining whether the likely volume would be

significant, the Commission "shall consider all relevant economic

factors," including likely increases in production capacity or

current unused capacity in the exporting country, barriers to

importation of subject merchandise in other countries, and

product-shifting potential in the exporting country.[1] 19 U.S.C.

---

[1] The statute specifies that in assessing the likely volume
of subject imports, the Commission shall consider, in addition to
any other relevant economic factors, the following economic
factors:

   (A) any likely increase in production capacity or
   existing unused production capacity in the exporting
   country,
   (B) existing inventories of the subject merchandise, or

§§ 1675a(a)(2)(A)-(D).

In determining the second factor, the likely price effects if the order is revoked, the Commission shall consider whether "there is likely to be significant price underselling by imports of the subject merchandise as compared to domestic like products," and whether "imports of the subject merchandise are likely to enter the United States at prices that otherwise would have a significant depressing or suppressing effect on the price of domestic like products." 19 U.S.C. §§ 1675a(a)(3)(A)-(B).

Analyzing the third factor, the likely impact of subject imports on the domestic industry if the order is revoked, the Commission "shall consider all relevant economic factors which are likely to have a bearing on the state of the industry in the United States," including:

> (A) likely declines in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,
> (B) likely negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment, and
> (C) likely negative effects on the existing development and production efforts of the industry, including

---

> likely increases in the inventories,
> (C) the existence of barriers to the importation of such merchandise into countries other than the United States, and
> (D) the potential for product-shifting if production facilities in the foreign country, which can be used to produce the subject merchandise, are currently being used to produce other products.

19 U.S.C. §§ 1675a(a)(2)(A)-(D).

> efforts to develop a derivative or more advanced
> version of the domestic like product.

19 U.S.C. §§ 1675a(a)(4)(A)-(C).  The relevant economic factors

are to be evaluated "within the context of the business cycle and

the conditions of competition" of the domestic industry.  19

U.S.C. § 1675a(a)(4).

Throughout the Commission's analysis of these factors, the

Commission shall consider its prior injury determination,[2] any

improvement in the domestic industry related to issuance of the

order, the potential vulnerability of the domestic industry if

the order were revoked, and the ITA's findings of duty

absorption.  19 U.S.C. §§ 1675a(a)(1)(A)-(D).  In considering any

and all of the factors required by § 1675a, no one factor is

dispositive.  19 U.S.C. § 1675a(a)(5).

   B.   Summary of the Instant Sunset Review

The original investigation by the Commission in 1994 found

that the U.S. industry was being materially injured by reason of

less than fair value imports of wire rod from France.  See

Stainless Steel Wire Rod From Brazil and France, USITC Pub. 2721,

Inv. Nos. 731-TA-636 and 637 (Final) (Jan. 1994).  This

determination caused the issuance of an antidumping duty order on

---

   [2]  "The Commission shall take into account . . . its prior
injury determinations, including the volume, price effect, and
impact of imports of the subject merchandise on the industry
before the order was issued . . . ."  19 U.S.C. § 1675a(a)(1)(A).

imports of wire rod from France.  See Certain Stainless Steel
Wire Rod From France, 59 Fed. Reg. 4022 (Jan. 28, 1994).

Five years after the original investigation, pursuant to 19
U.S.C. § 1675(c), the Commission instituted sunset reviews of
countervailing duty orders on imports of wire rod from Brazil,
France, India, and Spain.  See Stainless Steel Wire Rod From
Brazil, France, India, and Spain, 64 Fed. Reg. 35,697 (July 1,
1999) ("Notice of Sunset Review").  The Commission later decided
to do a full review rather than an expedited review because of
the "adequate" responses to its Notice of Sunset Review from the
domestic interested party group and France, and for other reasons
in the reviews of Brazil, India, and Spain, which had not
submitted adequate responses.  See Stainless Steel Wire Rod From
Brazil, France, India, and Spain, 64 Fed. Reg. 55,962 (Oct. 15,
1999) ("Full Review Notice").  The Commission later stated that
the reason for the full reviews of Brazil, India, and Spain,
despite their inadequate responses, was "to promote
administrative efficiency." See Sunset Review at 3.

     *1.    Cumulation*

In the Sunset Review, the Commission first undertook to
explain its decision not to cumulatively assess the volume, price
effect, and impact of imports of wire rod from France, India,
Brazil, and Spain.  The sunset reviews for each country were
initiated on the same day.  See Notice of Sunset Review.  The

Commission determined that imports of wire rod from France, Brazil, and India would compete with each other and the domestic like product in the U.S. market. Id. at 15. Although the Commission found that imports of wire rod from Spain would likely have no discernible adverse impact on the U.S. industry if the countervailing duty order were revoked, preventing cumulation of Spanish imports, it did not conclude the same with respect to subject imports from France, Brazil, and India. Sunset Review at 13. Therefore, the Commission could have permissibly exercised its discretion to cumulate subject imports from France, Brazil, and India. See 19 U.S.C. § 1675a(a)(6).

Despite the findings regarding competition and discernible adverse impact, the Commission declined to cumulate imports of wire rod from France with imports from India and Brazil, citing different "conditions of competition for French wire rod relative to imports from Brazil and India." Id. at 16. Commissioner Bragg did not join in that portion of the Sunset Review, and instead cumulated French, Brazilian, and Indian imports for purposes of the sunset review.[3] Id. at 16 n.73.

---

[3] The Commission's analysis in the Sunset Review is the view of Commissioners Miller, Hillman, and Bragg. Commissioner Bragg, while agreeing with the Commission's conclusion to not revoke the order, cumulated French imports with those of Brazil and India. Sunset Review at 13 n.54. The Commission's vote not to revoke the antidumping duty order was three votes in favor of revocation, and three votes opposed. Under the statute, a tie vote results in retention of the antidumping duty order. 19 U.S.C. § 1677(11) (2000).

*2.    Conditions of Competition*

Regarding the conditions of competition, the Commission found that U.S. domestic demand for wire rod is inelastic, i.e., that it does not respond significantly to price changes. Sunset Review at 17. The Commission found that manufacturers are able to use the same equipment to produce wire rod and other long steel products, which allows for product shifting. Id. The U.S. wire rod industry has undergone substantial consolidation since the original investigation, and [          ] capacity in the domestic industry, coupled with declining production, has resulted in significant declines in capacity utilization. See id. at 18. The Commission cited the percentage of nonsubject imports in the U.S. market, listed various countries that had duty orders on their imports of wire rod, and referred to the captive consumption percentage of wire rod. See id. at 18. Finding that these conditions of competition were "likely to prevail for the reasonably foreseeable future," the Commission then undertook to analyze the volume, price effect, and impact of imports from France against this background. Id. at 19.

*3.    Volume*

To analyze whether the likely volume of wire rod imports would be significant if the order is revoked, the statute requires the Commission to assess the volume either in absolute terms, or relative to U.S. production or consumption. See 19

U.S.C. § 1675a(a)(2); <u>Sunset Review</u> at 11.  In the analysis of likely import volume, the Commission acknowledged that it "must consider 'all relevant economic factors,'" including the four specific factors listed in 19 U.S.C. §§ 1675a(a)(2)(A)-(D).  <u>See</u> <u>id</u>. (quoting 19 U.S.C. § 1675a(a)(2)).

The Commission determined that the import volume of wire rod from France would likely be significant if the countervailing duty order were revoked.  <u>See</u> <u>Sunset Review</u> at 27.  Factors cited by the Commission included U-SI's "significant excess capacity," despite its high level of capacity utilization; U-SI's [

]; the existence of antidumping duty orders covering a number of other countries importing wire rod into the United States; the fact that French producers doubled exports to the United States during the original investigation's period of review, and could likely do so again if the antidumping duty order were removed; high prices for wire rod in the United States, which make it an attractive market; and the presence of U-SI's affiliated companies in the United States, which are ready customers for U-SI.  <u>See</u> <u>id.</u> at 27-28.

       *4.   Price Effect*

To evaluate the likely price effect, the Commission must "consider whether there is likely to be significant underselling by the subject imports as compared with domestic like products and whether the subject imports are likely to enter the United

States at prices that would have a significant depressing or
suppressing effect on the price of domestic like products."
Sunset Review at 11 (citing 19 U.S.C. § 1675a(a)(3)).

The Commission determined that the wire rod imports from
France would "likely be priced aggressively and have significant
depressing and suppressing effects on the prices of the domestic
like product."  Sunset Review at 29-30.  In support of its
conclusion, the Commission cited record evidence of the
following: underselling by French importers during the original
investigation; inelastic demand and elastic supply in the
domestic market for wire rod; reports that purchasing decisions
were usually based on price; similarity between the proportion of
domestic production that entered the market and competed with
subject imports in the sunset review and in the original
investigation; and instances of underselling by importers of
French wire rod during the sunset review period.[4]  See id.

> *5.    Impact*

The Commission stated it would evaluate the factors
enumerated in 19 U.S.C. § 1675a(a)(4), see supra, Part II.A, to
determine the likely impact of imports of wire rod if the
countervailing duty orders were revoked, considered "within the
context of the business cycle and the conditions of competition

---

[4]  The Commission considered instances of overselling not to
be probative in this investigation since an antidumping duty
order was in place.  See Sunset Review at 30.

that are distinctive to the industry." Id. at 12 (citing 19 U.S.C. § 1675a(a)(4)).

The Commission concluded that revocation of the antidumping duty order on wire rod imports from France would have a significant adverse impact on several aspects of the domestic industry. See Sunset Review at 31. Based on its investigation into volume, price effects, and impact, the Commission found "that revocation of the antidumping duty order on [wire rod] imports from France is likely to lead to continuation or recurrence of material injury to the U.S. [wire rod] industry within a reasonably foreseeable time." Id.

## III. Discussion

### A. The Commission's finding that subject imports would likely increase to a significant level is supported by substantial evidence and is in accordance with law.

Plaintiffs maintain that the Commission's determination that French wire rod imports would likely be significant is unsupported by substantial evidence and is not in accordance with law. Plaintiffs argue several points to support their position: the common theme among them is that the Commission incorrectly interpreted the evidence before it. The Commission responds that there is substantial evidence to support its interpretation, and that under the applicable standard of review the Court may not reverse the Commission's determination merely because the plaintiffs' view of the same evidence leads to a contrary

conclusion.  For the following reasons, the Court finds that there is substantial evidence supporting the Commission's conclusion that French wire rod imports would likely increase to a significant level.

Plaintiffs assert that the Commission erred because (1) the evidence shows that U-SI currently has no excess capacity and will not in the reasonably foreseeable future; (2) U-SI's export history indicates it is not likely to increase exports to the United States; (3) duty orders on other importers of wire rod do not indicate U-SI would increase exports to the United States; (4) the Commission cannot rely on the doubling of imports during the original investigation since that was a product of removal of a voluntary restraint agreement ("VRA"); and (5) U-SI's production efforts are focused on higher-value stainless steel bar and wire so that U-SI will not shift to producing wire rod.[5] The Court will consider each argument in turn.

First, plaintiffs claim that U-SI's average capacity utilization rate of [  ] percent is "virtually" full capacity for a wire rod manufacturer.  Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Judgment Upon the Agency Record ("Plaintiffs' Memorandum") at 28.  Moreover, they note that U-SI's capacity utilization was [  ] percent for the first quarter

---

[5]  Plaintiffs do not dispute that it is physically possible to shift production from stainless steel bar and wire to wire rod.  See Sunset Review at 17 n.85.

of 2000, and U-SI has been turning away orders, and argue that U-SI therefore could not increase exports to the United States. Id. at 29. Plaintiffs cite several Commission investigations where capacity utilization rates were high, and the Commission concluded that exports would not significantly increase to the United States.[6] See, e.g., Synthetic Methionine From Japan, USITC Pub. 3205, Inv. No. AA1921-115 (Review) (July 1999) (significant import volume unlikely because available capacity would not be a significant volume in the U.S. merchant market); Stainless Steel Plate From Sweden, USITC Pub. 3204, Inv. No. AA-1921-114 (Review) (July 1999) (high capacity utilization rates mean that Sweden cannot significantly increase export volume to the United States); Certain Steel Wire Rope From Japan, Korea, and Mexico, USITC Pub. 3259, Inv. No. 731-TA-547 (Review) (Dec. 1999) (same); Sugar From the European Union; Sugar From Belgium, France, and Germany; and Sugar and Syrups From Canada, USITC Pub. 3238, Inv. Nos. 104-TAA-7 (Review), AA1921-198-200 (Review), and 731-TA-3 (Review) (Sept. 1999) (significant import volume

---

[6] Plaintiffs' claim that the Commission's determination is not in accordance with law because other sunset reviews with similar circumstances have led to revocation of the duty order; however, other sunset reviews are of limited precedential value, and the real question is whether the unique circumstances of this case constitute substantial evidence supporting the Commission's determination. See Goss Graphics Systems, Inc. v. United States, 216 F.3d 1357 (Fed. Cir. 2000)

unlikely because available capacity would not be significant in the U.S. merchant market).

What these investigations do not represent is a Commission stance that high capacity utilization necessarily means that imports will not increase significantly.  Instead, these investigations highlight that the Commission's concern is whether the exporting country's unused capacity represents a significant percent of domestic demand for the products.  See generally 19 U.S.C. § 1675a(a)(2) (the Commission is to consider unused production capacity to assess import volume in absolute terms or relative to U.S. production or consumption).  In the instant case, the Commission reasonably concluded that U-SI's excess capacity, when viewed as a percentage of U.S. consumption, was significant.[7]  Sunset Review at 27.  Moreover, the Commission also noted that U-SI plans to [      ] capacity [

].  Id.  And plaintiffs' argument that the Commission overlooked evidence that first-quarter of 2000 capacity utilization was [  ] percent merely bolsters the Commission's determination that U-SI is able to operate at capacity levels above "virtually" full capacity of [  ] percent.  For these reasons, the Court concludes that there is substantial evidence to support the Commission's decision that

_____

[7]  US-I's excess capacity was [    ] percent of U.S. consumption in 1999.  Sunset Review at 27.

high capacity utilization is not dispositive of the import volume issue.  See Goss Graphics Systems, Inc. v. United States, 22 CIT 983, 990-91, 33 F. Supp. 2d 1082, 1090-91 (1998), aff'd Goss Graphics Systems, Inc. v. United States, 216 F.3d 1357 (Fed. Cir. 2000).

Plaintiffs next challenge the Commission's conclusion that the [       ] in capacity could be utilized to increase export volume to the United States.  The statute directs the Commission to consider "any likely increase in production capacity or existing unused production capacity" in the exporting country. 19 U.S.C. § 1675a(a)(2).  Plaintiffs insist that the evidence indicates the [       ] capacity would be used to further long-standing relationships with European customers and for further downstream production of higher-valued products by U-SI.  As support, plaintiffs point to growing demand in Europe for wire rod, and to the fact that high transportation costs to the United States compared to Europe offset the higher wire rod prices in the United States.  The Commission points out, however, that testimony from plaintiffs' witness indicates that prices in the U.S. market are very attractive.  See Memorandum of Defendant U.S. International Trade Commission in Opposition to Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record ("Defendant's Memorandum") at 26-27; see generally Sunset Review at 28.  The Commission also found that the European demand for wire rod

varied considerably so that growth in European demand did not necessarily lead to the conclusion that [                    ] would be shipped to European customers.  See Sunset Review at 28 n.163.  Finally, the Commission observed that [

          ] in the downstream bar and wire merchant market meant that U-SI would likely shift production to wire rod, and that [                    ] could be used for exporting wire rod. See 19 U.S.C. § 1675a(a)(2)(D).

Plaintiffs also claim that the Commission's reliance on U-SI's high percentage of exports as evidence of likely significant export volume to the United States is misplaced.  Since [  ] percent of U-SI's exports are to European customers, and only [   ] percent of U-SI's total production is exported to the U.S. market, any excess capacity would be exported to Europe.[8]  The Commission reasonably concluded that U-SI's emphasis on exports, [          ] of its production, could be shifted to the U.S. market, and that higher U.S. prices for wire rod would make such a shift likely.  See Sunset Review at 27 n.159.[9]

---

[8]  Plaintiffs do not mention what percentage of U-SI's total exports are to the U.S. market, but it is necessarily less than [  ] percent.

[9] According to the testimony of a U-SI sales manager before the Commission, despite additional costs to sell in the U.S., "[t]oday, the situation is such that there clearly should be an incentive in selling in the U.S."  Transcript of Commission's Public Hearing of May 23, 2000, at 180 (Bernard Heritier of U-SI).

An additional factor relied on by the Commission is that existing duty orders cover wire rod producers in Italy, Spain, and Sweden, which compete with U-SI in both the European and domestic markets.  Plaintiffs contend that the presence of these orders stabilizes U.S. domestic price, as in <u>Stainless Steel Plate From Sweden</u>, and provides protection to the domestic wire rod industry.  However, as the Commission found, if U-SI's duty order is revoked, it will gain a relative advantage over these exporters in the domestic market, which it lacks in the European market.  Therefore, the Commission reasonably found that U-SI exports would likely increase to the United States, in part, on evidence of existing duty orders on countries that compete with U-SI.  <u>See</u> <u>Sunset Review</u> at 28 n.160.

Plaintiffs next attack the Commission's reliance on the rapid expansion of French wire rod imports during the original investigation as an indicator of likely behavior if the antidumping duty order were removed.  The plaintiffs argue that this conclusion is erroneous because U-SI lacks the excess capacity which makes a rapid expansion of exports practically impossible.  Plaintiffs point out that the rapid increase in exports of wire rod to the United States during the original investigation, from 1991 to 1992, was the result of several factors, including the expiration of a voluntary restraint agreement; U-SI's recent acquisition of a U.S. subsidiary which

initially needed to import a high volume of U-SI wire rod; and U-SI's lower capacity utilization during the original investigation.  U-SI also notes that its exports to the U.S. market have remained steady in recent years, as evidenced by a comparison of the first quarter of 1999 to the first quarter of 2000.

The Court concludes that the Commission did not unreasonably give weight to evidence of increased imports from France during the original investigation.  To the contrary, the statute directs the Commission to consider the original investigation in its sunset review, particularly because "this period is the most recent time during which imports of subject merchandise competed in the U.S. market free of the discipline of an order agreement." Statement of Administrative Action, H.R. Rep. No. 103-316, Vol. I, at 884 (1994).  The Commission may have reasonably concluded that the removal of the antidumping duty order would increase imports in the United States, in the same manner that removal of the VRA during the period of review in the original investigation resulted in increased imports.  In addition, both of U-SI's U.S. affiliates reported [                    ] of wire rod from U-SI in 1999 over 1997, which fact supports the Commission's reasonable determination of a likely increase in imports.

Plaintiffs' final disagreement with the Commission's determination is that the Commission discounted evidence that U-

SI's wire rod production was directed towards captive consumption to produce higher valued products, namely stainless steel bar and wire.  Plaintiffs charge that this analysis is erroneous because the absolute proportion of captive consumption to production is irrelevant, and that the Commission should focus instead on the [          ] ratio of captive consumption to production. Plaintiffs also claim that [                         ] is irrelevant because the sale of downstream products is still more profitable to U-SI than selling wire rod on the open market.  The Commission discounted this evidence because U-SI internally consumes [                ] its production of wire rod, and there was [                      ] of down stream production of stainless steel bar and wire from 1998 to 1999.  The Court finds that the Commission reasonably interpreted evidence of U-SI's captive consumption.  Therefore, the Commission's determination that French wire rod imports would likely be significant is supported by substantial evidence and is in accordance with law.

> B.   The Commission's finding that subject imports would likely have significant depressing and significant price suppressing effects on prices of the domestic like product, is supported by substantial evidence and is in accordance with law.

Plaintiffs' argue that the Commission's price effect determination is not supported by substantial evidence and is contrary to law.  The Statute directs the Commission to evaluate the "price effect," determined by considering whether "there is

likely to be significant price underselling by imports . . . as compared to domestic like products," and whether "imports of the subject merchandise are likely to enter the United States at prices that otherwise would have a significant depressing or suppressing effect on the price of domestic like products." 19 U.S.C. § 1675a(a)(3). The Commission answered in the affirmative and based its conclusion on several factors: "the likely significant volume of imports, the high level of substitutability of the subject imports, the commodity-type nature of the product, the limited change in demand in response to price, the current underselling with an order in place, and the underselling by the imports in the original investigation . . . ." Sunset Review at 30.

With respect to the first factor, plaintiffs refer to their previous argument regarding volume, and conclude that without substantial evidence of likely significant import volume, the Commission could not find that there would be significant price underselling by French imports of wire rod. For the reasons discussed above, supra, Part III.A, there is substantial evidence to support the Commission's finding of likely significant import volume. Therefore, the Commission acted reasonably in basing its conclusion of price effect, in part, on likely significant import volume.

The second factor plaintiffs challenge is the Commission's reliance on current underselling of French wire rod under the existing antidumping duty order.  See Sunset Review at 29.  The Commission found evidence of underselling in 8 of 21 price comparisons during the period of review for the sunset review, and dismissed evidence of overselling under the existing antidumping duty order as not probative of likely pricing behavior if the antidumping duty order were removed.  Plaintiffs find this conclusion "incredibl[e]" since the evidence showed more instances of overselling than underselling, and the average unit values ("AUV") of French imports are $375 greater than the AUV of U.S. products in the first quarter of 2000.  Plaintiffs' Memorandum at 44.

The Commission describes its consideration of underselling and overselling from a different perspective.  Despite equal instances of price underselling and overselling in the original investigation, and increasing demand in the U.S. wire rod market, the price of the most common grade of wire rod declined by nearly 15 percent and the domestic price of French imports decreased by an even greater percentage.  During the period of review for the sunset review, the Commission considered additional evidence, including the likely significant volume of imports from France, the high substitutability between French imports and the domestic

like product, and a likely limited increase in demand to offset a
decrease in price of wire rod.[10]  Sunset Review at 29.

Regarding AUV's, the Commission found that wire rod is
produced in a variety of sizes and grades, which arguably
supports its decision to disregard the AUV's.  See Sunset Review
at 3-4.  The Court cannot ascertain from the Sunset Review if
that was why the Commission did not consider the AUV's, but the
Commission did act reasonably not to consider AUV's since the
product mix of wire rod varied among the comparisons.[11]  See
Sunset Review at 3-4 & n.20, Allegheny Ludlum Corp. v. United
States, 25 CIT __, __, 116 F. Supp.2d 1276, 1287 (2000) vacated
on other grounds by 287 F.3d 1365 (Fed. Cir. 2002).  For the
foregoing reasons, the Court finds that the Commission's
determination that significant price suppressing and depressing
effects are likely is supported by substantial evidence and is in
accordance with law.

_____

[10]  The Commission had evidence before it of high price
elasticity of supply, relatively inelastic demand, and that a
majority of domestic purchasers of wire rod based their
purchasing decisions primarily on price.  See Sunset Review at
29.  This evidence reasonably led the Commission to conclude that
any increase in supply to the market will not cause the quantity
demanded to increase but will cause prices to fall.

[11]  The Commission notes in its cumulation discussion that
"average unit values of [wire rod] from France have been much
higher than those for [wire rod] from India, reflecting
differences in pricing practices and product mix."  Sunset Review
at 16.  This further suggests that the Commission was aware that
AUV's were of little probative value in price effect analysis
since the AUV's also reflected different product mixes.

C. The Commission's finding of significant adverse impact on the domestic industry is supported by substantial evidence and is in accordance with law.

Section 1675a(a)(4) of the statute requires the Commission to consider all relevant economic factors to determine whether revoking the antidumping duty order will likely result in a significant adverse impact on the domestic industry, and specifically lists several factors the Commission "shall" consider, including market share, utilization of capacity, and wages.[12]  No one factor is dispositive.  19 U.S.C. § 1675a(a)(1). These factors are to be evaluated "within the context of the business cycle and the conditions of competition that are distinctive to the affected industry."  19 U.S.C. § 1675a(a)(4). U-SI claims that the Commission contravened this subsection in two respects, first by not finding certain record evidence together with prior sunset reviews to be dispositive, and second by failing to consider all of the enumerated specific factors under § 1675a(a)(4).

*1.   Prior Sunset Reviews Do Not Provide Dispositive Evidence of Consistent Agency Practice*

According to plaintiffs, the Commission erred because certain record evidence present in the instant case was present in other sunset reviews wherein the Commission had found revocation of the duty orders appropriate.  Specifically, the

_____

[12]  See Part II.A, supra, for the relevant statutory language.

plaintiffs refer to evidence of: consolidation of the domestic wire rod industry; substantial investment by the domestic wire rod industry; a high level of captive consumption by the domestic wire rod industry; growing domestic and worldwide demand for wire rod; lack of capacity on the part of the domestic wire rod industry to fully supply the U.S. market; and pre-existing orders that cover most of the non-French imports of wire rod. Plaintiffs then cite to sunset reviews where the record evidence contained one or more of the aforementioned pieces of evidence, and the Commission revoked the orders. See, e.g., Certain Steel Wire Rope From Japan, Korea, and Mexico, USITC Pub. 3259, Inv. Nos. AA1921-124 and 731-TA-546-547 (Reviews) (Dec. 1999) (Commission cited to market consolidation and capital expenditures in revoking the order); Color Picture Tubes From Canada, Japan, Korea, and Singapore, USITC Pub. 3291, Inv. No. 731-TA-367-370 (Review) (Apr. 2000) (evidence of high level of captive consumption was a factor in the Commission's determination that there was no likely volume impact); Stainless Steel Plate From Sweden, USITC Pub. 3204, Inv. No. AA1921-114 (Review) (July 1999) (increasing U.S. demand would absorb any increase in imports from Sweden, so that the U.S. industry was not adversely affected); Carbon Steel Wire Rod From Argentina, USITC Pub. 3270, Inv. Nos. 701-TA-A (Review) and 731-TA-157 (Review) (Jan. 2000) (evidence that U.S. industry couldn't fully

supply the domestic market factored into the Commission's determination to revoke the order).  But see, e.g., Carbon Steel Butt-Weld Pipe Fittings From Brazil, China, Japan, Taiwan, and Thailand, USITC Pub. 3263, Inv. Nos. 731-TA-308-310 and 520-521 (Review) (Dec. 1999) (market consolidation was partly relied on by Commission in deciding not to revoke duty order); Cased Pencils From China, USITC Pub. 3328, Inv. No. 731-TA-669 (Review) (July 2000) (reduced prices would not stimulate additional demand and thus domestic industry would be materially injured); Sulfuric Acid From China and India, USITC Pub. 3301, Inv. Nos. 701-TA-318 (Review) and 731-TA-538 and 561 (Review) (May 2000) (despite capital expenditure by domestic producers, revocation of order would result in a substantial adverse impact on the domestic industry); Internal Combustion Industrial Forklift Trucks from Japan, USITC Pub. 3287, Inv. No. 731-TA-377 (Review) (April 2000) (increasing U.S. demand for product has not led to increased U.S. production); see also Polyethylene Terephthalate (Pet) Film from Korea, USITC Pub. 3278, Inv. No. 731-TA-459 (Review) (Feb. 2000). Still, plaintiffs assert that in light of "the record evidence and prior [sunset review] determinations," the only reasonable conclusion is that injury to the domestic industry cannot continue or recur.  Plaintiffs' Memorandum at 19.

Plaintiffs' argument fails for several related reasons. First, there is limited precedential value in sunset reviews

since each case presents unique interactions of the economic variables the Commission considers. See USEC, Inc. v. United States, 25 CIT __, __, 132 F. Supp. 2d 1, 14 (2001); Ranchers-Cattlemen Action Legal Foundation v. United States, 23 CIT 861, 891, 74 F. Supp. 2d 1353, 1379 (1999). What U-SI does not explicitly request, but is essentially asking, is for the Court to find that the Commission is departing from consistent agency practice. "An action by the ITC becomes an 'agency practice' when a uniform and established procedure exists that would lead a party, in the absence of notification of change, reasonably to expect adherence to the established practice or procedure." Ranchers-Cattlemen, 23 CIT 884-85, 74 F. Supp. 2d at 1374. It is difficult to establish agency practice in sunset reviews since the presence of a specific factor in a prior sunset review is not dispositive of how a factor is interpreted in the current sunset review, or of the ultimate decision on whether to revoke the order. Therefore, the Court's inquiry here is whether there is a rational basis in fact for the Commission's determination. American Lamb Co. v. United States, 4 Fed. Cir. (T) 47, 58-59, 785 F.2d 994, 1004 (1986).

To the extent that exporters challenging sunset reviews are able to demonstrate the existence of a consistent agency practice notwithstanding the intrinsic variability of each such review, plaintiffs in the instant case have clearly failed to do so here.

For each case that plaintiffs cite where the Commission found one

of the aforementioned factors persuasive in revoking an order,

there are other cases where the Commission did not find that same

factor sufficiently persuasive to revoke an order.  For these

reasons, the Commission's determinations in other sunset reviews

did not mandate revocation of the antidumping duty order in the

present case.

> *2.    The Commission Adequately Considered the Economic*
> *Factors*

U-SI asserts that the Commission erred as a matter of law by

not considering the factors found in 19 U.S.C. § 1675a(a)(4)(A)-

(C).[13]  The plaintiffs maintain that the Commission addressed the

---

[13]  The subsection states:

In evaluating the likely impact of imports of the
subject merchandise on the industry if the order is
revoked or the suspended investigation is terminated,
the Commission shall consider all relevant economic
factors which are likely to have a bearing on the state
of the industry in the United States, including, but
not limited to --
     (A) likely declines in output, sales, market
     share, profits, productivity, return on
     investments, and utilization of capacity,
     (B) likely negative effects on cash flow,
     inventories, employment, wages, growth,
     ability to raise capital, and investment, and
     (C) likely negative effects on the existing
     development and production efforts of the
     industry, including efforts to develop a
     derivative or more advanced version of the
     domestic like product.
The Commission shall evaluate all relevant economic
factors described in this paragraph within the context
of the business cycle and the conditions of competition
that are distinctive to the affected industry.

impact of revoking the antidumping duty order in one brief

paragraph that does not satisfy the Statute.  In that paragraph,

the Commission stated:

> We have concluded that revocation of the antidumping
> duty order on [wire rod] from France would likely lead
> to a significant increase in the volume of subject
> imports that would undersell the domestic like product
> and significantly suppress or depress U.S. prices.  We
> also find that the volume and price effects of the
> subject imports would likely have a significant adverse
> impact on the production, shipments, sales, market
> share, and revenues of the domestic industry.  This
> reduction in the industry's production, shipment,
> sales, market share, and revenues would adversely
> impact the industry's profitability and ability to
> raise capital and maintain necessary capital
> investments.  We therefore find that revocation of the
> antidumping duty order on [wire rod] imports from
> France is likely to lead to continuation or recurrence
> of material injury to the U.S. [wire rod] industry
> within a reasonably foreseeable time.

Sunset Review at 31.  While this paragraph is certainly a cursory

statement of conclusions regarding several of the factors set

forth in § 1675a(a)(4), it does not represent the full extent of

the Commission's discussion of those factors.  The Commission

also incorporated its analysis of the domestic industry on pages

23-25 of the Sunset Review by reference.  Sunset Review at 30

("As discussed above . . ." and "[a]s we noted . . ." both refer

to the conclusions reached in the analysis of the domestic

industry on pages 23-25 of the Sunset Review.).  In that

discussion the Commission analyzed the domestic industry, taking

---

19 U.S.C. §§ 1675a(a)(4).

into account its original investigation, including the volume, price effect, and impact of imports of the subject merchandise on the industry before the antidumping duty order was issued. Sunset Review at 23-25. In particular, the Commission stated that during the original investigation it had "concluded that the lower prices of the subject imports enabled them to increase market share in an expanding market at the expense of the domestic producers, leading to declines in domestic prices, domestic market share, production, shipments, and profitability." Sunset Review at 23.

The Commission also found that the domestic industry is in the same situation it was prior to the original investigation, when dumped imports led to a lower market share for the domestic industry, and consequently declines in domestic prices, production, shipments and profitability.[14] In discussing the likely impact of subject imports on the domestic industry if the duty order were revoked, the Commission stated that it discounted the significance of evidence that demand for wire rod is expanding by noting that "similar circumstances during the original investigation did not prevent dumped imports from France from capturing market share at the expense of the domestic

_____

[14] The statute requires the Commission to consider the original investigation in determining whether the material injury is likely to continue or recur within a reasonably foreseeable time if the order is revoked. 19 U.S.C. § 1675a(a)(1)(A).

industry."  Sunset Review at 30-31.  In light of these declines,
the Commission concluded that the industry's ability to raise
capital and maintain necessary capital investments would also
decline.

Against the backdrop of the Commission's disjunctive
analysis of the factors from 19 U.S.C. §§ 1675a(a)(4), the
plaintiffs' object that the Commission did not discuss all of the
factors, including the negative effects on cash flow,
inventories, employment, wages, return on investments, and
existing development and production efforts of the industry.
However, the Statute directs the Commission to consider only the
likely declines of these factors in the domestic industry, and
the presence or absence of any factor is not decisive.  See 19
U.S.C. § 1675a(a)(5).  The Court assumes that since the
Commission did not mention the other factors that the Commission
did not view declines in these factors as likely.  Because no
single factor is dispositive, the Commission is not required to
discuss every factor it considered when it cites to substantial
evidence to support its determination.  Cf. Goss Graphics
Systems, Inc. v. United States, 216 F.3d 1357, 1362-63 (Fed. Cir.
2000) (within the context of the Commission "addressing" several
of the factors required in its analysis, the Court found there
was substantial evidence supporting the Commission's
determination).  Therefore, the Commission did not err as a

matter of law by not mentioning all of the factors listed in 19 U.S.C. § 1675a(a)(4).

Additionally, the plaintiffs maintain that the Commission was required to forecast the quantity of imports and the degree of underselling and price suppression/depression in order to determine the impact of French imports of wire rod on the domestic industry. That level of precision is not required in sunset reviews, as the statute requires the Commission to determine "the likely impact of imports" on the domestic industry. See 19 U.S.C. § 1675a(a)(4). Furthermore, § 1675a(a)(6) gives discretion to the Commission to consider the degree of underselling. 19 U.S.C. § 1675a(a)(6) ("the Commission may consider the magnitude of the margin of dumping") (emphasis added). As the Federal Circuit explained:

> In no case will the Commission ever be able to rely on concrete evidence establishing that, in the future, certain events will occur upon revocation of an antidumping order. Rather, the Commission must assess, based on currently available evidence and on logical assumptions and extrapolations flowing from that evidence, the likely effect of revocation of the antidumping order on the behavior of importers.

Matsushita Elec. Indus. Co., Ltd. v. United States, 3 Fed. Cir. (T) 44, 750 F.2d at 927, 933 (1984). Therefore, the Commission's impact determination is supported by substantial evidence and in accordance with law.

    D.   <u>Commissioner Bragg's determination to cumulate subject imports from France with subject imports from Brazil and India is supported by substantial evidence and is in accordance with law.</u>

Under the statute the Commission may cumulate imports from subject countries if the sunset reviews were initiated on the same day, the Commission determines that there is a reasonable overlap in competition between imports from the subject countries and between the subject imports and the domestic like product, and the Commission does not find that the subject imports are likely to have no discernible adverse impact on the domestic industry. 19 U.S.C. § 1675a(a)(7). In the present sunset review, five Commissioners, including Commissioner Bragg, found that the three above requirements were met so that the Commission could exercise its discretion and cumulate imports. <u>See</u> <u>Sunset Review</u> at 1, n.1, and 29, n.59. While the Commission declined to cumulate on other grounds, see Part II.B.1, <u>supra</u>, Commissioner Bragg decided to cumulate imports of wire rod from India, Brazil, and France in her sunset review analysis.

Plaintiffs challenge the Commission's finding that the adverse impact provision was satisfied, i.e. the determination that the Commission could not conclude that there would likely be no discernible adverse impact. The plaintiffs' hope is that if the Court rejects the Commission's conclusion on that adverse impact provision, then Commissioner Bragg cannot cumulate imports for purposes of the sunset review analysis, and thus Commissioner

Bragg would have to reconsider her vote not to withdraw the duty order.

In discussing the adverse impact provision, the Commission referenced its discussion in the volume, price effect, and impact provisions of the Sunset Review as its reasoning.[15] Since the Court found that the Commission's determinations of volume, price effect, and impact were in accordance with law and supported by substantial evidence, the Court holds that the Commission's determination that it could not conclude there would likely be no discernible adverse impact on the domestic industry was likewise supported by substantial evidence and in accordance with law.

The plaintiffs also argue that Commissioner Bragg's determination to cumulate imports from France, India, and Brazil was an abuse of discretion, and unfairly penalized France for Brazil and India's failures to participate in the sunset review.

First, Commissioner Bragg did not abuse her discretion by cumulating imports. As discussed above, it was within the

_____

[15] The cumulation analysis in the Commission's opinion is disjointed. The decision to cumulate analytically comes before the analysis of volume, price effect, and impact. The Commission references the later discussions of volume, price effect, and impact to support its decision to cumulate. However, since the Commission's opinion analyzed the volume, price effect, and impact of imports from France separately from Brazil and India, that analysis can form the support for its determination that the adverse impact provision does not apply to prevent cumulation. See Angus Chemical Co. v. United States, 140 F.3d 1478, 1486 (Fed. Cir. 1998) (the Commission's findings do not need to be discussed in a particular place in the opinion).

Commission's discretion to cumulate imports because the requirements of § 1675a(a)(7) were met. There is no exception for cumulation in the statute based on non-participation in the sunset reviews. There is an express exception to cumulation under the adverse impact provision, and the Court declines to create an implied exception for non-participation when Congress clearly delineated the exceptions it intended under the Statute.[16]

There is also no evidence that France was unfairly penalized for the lack of participation by other parties. There is no evidence that Commissioner Bragg took any adverse inferences. The Commission stated that because a number of parties did not participate in the sunset review, the Commission "relied on the facts available . . . which consist primarily of the evidence in the record from the Commission's original investigations, the information collected by the Commission since the institution of these review, and information submitted by the domestic producers and other parties in these reviews." <u>Sunset Review</u> at 10-11. Therefore, Commissioner Bragg's determination to cumulate imports from France, India, and Brazil was not an abuse of discretion and did not unfairly penalize France for the non-participation of India and Brazil.

---

[16] Cumulation is expressly forbidden if the Commission cannot find that there would likely be no discernible adverse impact to the domestic industry. 19 U.S.C. § 1675a(a)(6).

## IV.  Conclusion

For all of the foregoing reasons, the Court sustains the Commission's <u>Sunset Review</u>.  A separate order will be entered accordingly.

_____

**Senior Judge Richard W. Goldberg**

**Date: July 31, 2002**
**New York, New York**