Slip Op. 04-65

## UNITED STATES COURT OF INTERNATIONAL TRADE

USINOR, BEAUTOR, HAIRONVILLE, SOLLAC
ATLANTIQUE, SOLLAC LORRAINE, and
USINOR STEEL CORP.,

   Plaintiffs,

  v.

UNITED STATES,

   Defendant,

  and

BETHLEHEM STEEL CORP., ISPAT INLAND,
INC., LTV STEEL CO., NATIONAL STEEL
CORP., and U.S. STEEL GROUP,
a unit of USX CORP.,

   Defendant-Intervenors.

Before: WALLACH, Judge
Court No.: 01-00010

**PUBLIC VERSION**

---

[Final Determination is affirmed.]     Decided: June 9, 2004

Shearman & Sterling, (Thomas Bernard Wilner, Chris Ryan), for Plaintiffs Usinor, Beautor, Haironville, Sollac, Atlantique, Sollac Lorraine, and Usinor Steel Corp.

Sharretts, Paley, Carter & Blauvelt, P.C., (Gail T. Cumins), for Plaintiffs Thyssen Krupp Stahl AG, Stahlwerke, Bremen GmbH, EKO Stahl GmbH, and Salzgitter AG.

Charles Alfred St. Charles, Mary Jane Alves, Gracemary R. Roth-Roffy, Office of the General Counsel, U.S. International Trade Commission, Washington, D.C., for Defendant.

Skadden, Arps, Slate, Meagher & Flom LLP, (Stephen P. Vaughn), for Defendant-Intervenors.

## OPINION

**WALLACH, Judge:**

# I
# INTRODUCTION

Plaintiffs Usinor, Beautor, Haironville, Sollac Atlantique, Sollac Lorraine, and U.S. importer Usinor Steel Corporation (collectively "French Producers")[1]; Plaintiffs Thyssen Krupp Stahl AG, EKO Stahl GmbH, Stahwerke Bremen GmbH, and Salzgitter (collectively "German Producers"); Defendant-Intervenors[2] Bethlehem Steel Corp., Ispat Inland, Inc., LTV Steel Company, Inc., National Steel Corporation, and U.S. Steel Group, filed comments on the United States International Trade Commission's (hereafter "Commission" or "ITC") Remand Determination of September 17, 2002 ("Remand Determination"), on the final determination in the five-year administrative review ("Sunset Review") of antidumping and countervailing duty orders on corrosion resistant steel products ("CRCS") from France and Germany. The Remand Determination was completed under this court's ruling in Usinor v. United States, Slip Op. 2002-70, 2002 Ct. Int'l Trade LEXIS 98 (July 19, 2002) ("Usinor I"). Plaintiffs contest the Commission's determination that revocation of the countervailing duty orders and antidumping duty orders on certain carbon steel products from specified countries, including corrosion-resistant carbon steel from France and Germany, would likely lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time. See

---

[1] The French Producers were represented previously by Allan Paul Victor of Weil, Gotshal & Manges, LLP, until the firm terminated its representation on February 14, 2003.

[2] The court has granted in this case motions for withdrawal of appearance for Bethlehem Steel Corp., Ispat Inland, Inc., and LTV Steel Company, Inc. There have been no motions made to withdraw these companies and National Steel Corp. as parties by counsel.

Certain Carbon Steel Products From Australia, Belgium, Brazil, Canada, Finland, France, Germany, Japan, Korea, Mexico, Netherlands, Poland, Romania, Spain, Sweden, Taiwan, and United Kingdom, 65 Fed. Reg. 75,301 (Dec. 1, 2000). The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000). The court finds the Commission's findings to be supported by substantial evidence and in accordance with the law.

## II
## BACKGROUND

In August 1993, the Commission found material injury or threat of material injury to U.S. domestic industry because of less than fair value ("LTFV") and subsidized imports of CRCS from, among other countries, France and Germany. See Certain Flat-Rolled Carbon Steel Products from Argentina, Australia, Austria, Belgium, Brazil, Canada, Finland, France, Germany, Italy, Japan, Korea, Mexico, the Netherlands, New Zealand, Poland, Romania, Spain, Sweden, and the United Kingdom, USITC Pub. 2664 (Aug. 1993) ("Original Determination"). The Department of Commerce thus published antidumping and countervailing duty orders covering the subject merchandise from these countries. See Countervailing Duty Order and Amendment to Final Affirmative Countervailing Duty Determination: Certain Steel Products From France, 58 Fed. Reg. 43,759 (Aug. 17, 1993); Countervailing Duty Orders and Amendment to Final Affirmative Countervailing Duty Determinations: Certain Steel Products From Germany, 58 Fed. Reg. 43,756 (Aug. 17, 1993); Antidumping Duty Order and Amendments to Final Determinations of Sales at Less Than Fair Value: Certain Hot-Rolled Carbon Steel Flat Products, Certain Cold-Rolled Carbon Steel Flat Products, Certain Corrosion-Resistant Carbon Steel Flat Products and Certain Cut-to-Length Carbon Steel Plate from France, 58 Fed. Reg. 44,169 (Aug. 19, 1993); Antidumping Duty Orders and Amendments to Final Determinations of Sales at Less

3

Than Fair Value: Certain Hot-Rolled Carbon Steel Flat Products, Certain Cold-Rolled Carbon Steel Flat Products, Certain Corrosion-resistant Carbon Steel Flat Products and Certain Cut-to-Length Carbon Steel Plate From Germany, 58 Fed. Reg. 44,170 (Aug. 19, 1993).

On September 1, 1999, the Commission concurrently instituted sunset reviews concerning the countervailing duty and antidumping orders on certain carbon steel products from France and Germany with sunset reviews regarding CRCS from Australia, Canada, Japan, and Korea.[3] See Carbon Steel Products from Australia, Belgium, Brazil, Canada, Finland, France, Germany, Japan, Korea, Mexico, Netherlands, Poland, Romania, Spain, Sweden, Taiwan, and United Kingdom, 64 Fed. Reg. 47,862 (Sept. 1, 1999). On December 3, 1999, the Commission decided to conduct full reviews. See Certain Carbon Steel Products From Australia, Belgium, Brazil, Canada, Finland, France, Germany, Japan, Korea, Mexico, Netherlands, Poland, Romania, Spain, Sweden, Taiwan, and United Kingdom, 64 Fed. Reg. 71,494 (Dec. 21, 1999).

Under to 19 U.S.C. § 1675a(a)(7) (2002), the Commission "cumulated" likely volume and price effects from all the countries under review. Certain Carbon Steel Products From Australia, Belgium, Brazil, Canada, Finland, France, Germany, Japan, Korea, Mexico, Netherlands, Poland, Romania, Spain, Sweden, Taiwan, and United Kingdom, 65 Fed. Reg. 75,301 (Dec. 1, 2000). The Commission also found that revoking the subject orders would severely impact the domestic CRCS industry. The Commission stressed that the domestic industry faced significant volume and price declines for its product given the determination that importing nations had high levels of excess capacity coupled with cost margins that necessitate

---

[3] The Commission's review also encompassed other carbon steel products: cut-to-length steel plate and cold-rolled carbon steel flat products.

maximum employment of capacity.

On November 2, 2000, the Commission determined that revoking the antidumping and countervailing duty orders on CRCS from Australia, Canada, France, Germany, Japan, and Korea would cause the continuation or recurrence of material injury to U.S. domestic industry within a reasonably foreseeable time. See Certain Carbon Steel Products From Australia, Belgium, Brazil, Canada, Finland, France, Germany, Japan, Korea, Mexico, Netherlands, Poland, Romania, Spain, Sweden, Taiwan, and United Kingdom, 65 Fed. Reg. 75,301 (Dec. 1, 2000) ("Notice of Commission's Determination"); Certain Carbon Steel Products From Australia, Belgium, Brazil, Canada, Finland, France, Germany, Japan, Korea, Mexico, The Netherlands, Poland, Romania, Spain, Sweden, Taiwan, and the United Kingdom, USITC Pub. No. 3364. (Nov. 27, 2000) ("Review Determination"). The French and German producers and exporters of the subject merchandise appealed the Commission's Review Determination to this Court. The court in Usinor I remanded and required the Commission to reexamine its "no discernible adverse impact" findings with respect to French and German imports and to reevaluate its cumulation, likely volume, likely price, and likely impact findings. Familiarity with the decision in Usinor I is presumed.

Presently before the court is the ITC's Remand Determination in which the Commission affirmed its views and determined that the revocation of the antidumping and countervailing duty orders on corrosion-resistant steel from France and Germany would be likely to lead to the continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time.

The court finds that the ITC has made its Remand Determination in accordance with law.

5

# III
## THE COURT'S INSTRUCTIONS AND PARTIES' ARGUMENTS

The court instructed the ITC to address the French and German producers' evidence "regarding capacity utilization and the impact of the EU"; "discuss the key issues in its determination"; and "discuss its obligations under the Antidumping Agreement vis-à-vis 19 U.S.C. § 1675a(a)(7) and must fully explain whether its position can be reconciled with, or unavoidably contradicts, the Antidumping Agreement." Usinor I, Slip Op. 2002-70 at 44-45.

The Plaintiff German Producers argue that the ITC's Remand Determination fails to address adequately the court's concerns as to deficiencies in the ITC's Original Determination; improperly ignores evidence supporting the German Producers' position; and does not direct the court's attention to sufficient evidence to support a conclusion that revocation of the antidumping orders on corrosion resistant carbon steel flat products from Germany is likely to have a discernible adverse impact on the domestic industry.

The Plaintiff French Producers argue that the ITC's determination that the French Producers have the ability to increase exports to the United States is not supported by substantial evidence; the ITC again failed to show that there is a 'likelihood' to increase exports to the United States; and the Commission did not follow the court's instructions with regards to the proper treatment of U.S. international obligations.

The Defendant-Intervenors argue that the ITC correctly executed the cumulation analysis of French and German imports in accordance with U.S. statute and U.S. international obligations; the Commission's findings concerning no discernible adverse impact as well as EU integration are supported by substantial evidence and are in accordance with the law.

6

## IV
## STANDARD OF REVIEW

In reviewing final determinations in antidumping duty investigations, the court will hold unlawful those agency determinations that are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(I) (2000). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consol. Edison Co. of New York v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938); Matsushita Elec. Indus. Co., Ltd. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984). The court takes into account the entire record, "including what fairly detracts from the substantiality of the evidence." Atlantic Sugar, Ltd. v. United States, 744 F.2d 1556, 1562 (Fed. Cir. 1984). Thus, the court will affirm the agency's factual determinations so long as they are reasonable and supported by the record. Id. In its analysis, the court may not reweigh the evidence or substitute its own judgment for that of the agency. See Nippon Steel Corp. v. United States, 301 F. Supp. 2d 1355, 1360 (CIT 2003). The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620, 86 S. Ct. 1018, 16 L. Ed. 2d 131 (1966).

In reviewing an agency's construction of a statute, this court undertakes a two-step analysis established by the Supreme Court in Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842-43, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984). First, the court must consider "whether Congress has directly spoken to the precise question at issue." Id. at 842. If so, this court and the agency "must give effect to the unambiguously expressed intent of Congress." Id. at 843. If, however, Congress has not spoken directly on the issue, this court

7

looks at whether the agency's interpretation "is based on a permissible construction of the statute." Id. To survive judicial scrutiny, an agency's construction need not be the only reasonable interpretation or even the most reasonable interpretation. Zenith Radio Corp. v. United States, 437 U.S. 443, 450, 98 S. Ct. 2441, 57 L. Ed. 2d 337 (1978). A court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another. Id. "Deference to an agency's statutory interpretation is at its peak in the case of a court's review of Commerce's interpretation of the antidumping laws." Koyo Seiko Co. v. United States, 36 F.3d 1565, 1570 (Fed. Cir. 1994); Daewoo Elecs. Co. v. United States, 6 F.3d 1511, 1516 (Fed. Cir. 1993), cert. denied, 114 S. Ct. 2672 (1994).

**V**
**ANALYSIS**

**A**
**The Commission's Decision to Cumulate the French and German Producers' Subject Imports Is Supported by Substantial Evidence Because its Findings of Likely Discernible Adverse Impact Are Supported by Substantial Evidence and Are In Accordance with Law**

The Commission argues that cumulation is discretionary in five-year reviews. The Commission states that it may exercise its discretion to cumulate only if the reviews are initiated on the same date and it determines that subject imports are likely to compete with each other and the U.S. domestic like product.

The ITC cannot cumulate if the subject imports are likely to have no discernible adverse impact on domestic industry upon revocation. In this case, the ITC did make a determination of likely discernible adverse impact by CRCS imports from France and Germany. Furthermore, the ITC found reasonable overlap of competition among subject imports and the domestic like product and no significant differences in conditions of competition among the subject countries.

8

ITC Remand Results at 3. Thus, the ITC says it cumulated imports from Australia, Canada, France, Germany, Japan, and Korea. The Defendant-Intervenors argue support the Commission's findings regarding cumulation and claim that they are supported by substantial evidence.

### The ITC's Sunset Review Procedures

The ITC is required to conduct sunset reviews every five years after the publication of an antidumping duty order or a previous sunset review. See 19 U.S.C. § 1675(c)(1); Ugine-Savoie Imphy v. United States, 248 F. Supp. 2d 1208, 1210 (CIT 2002). In sunset reviews, the ITC "shall determine whether revocation of an order . . . would be likely to lead to continuation or recurrence of material injury within a reasonably foreseeable time." 19 U.S.C. § 1675a(a)(1); Usinor Industeel, S.A. v. United States, Slip Op. 2003-118 at 4, 2003 Ct. Int'l. Trade LEXIS 116 (Sept. 8, 2003). In making its material injury determination, the ITC, in its discretion,

> may cumulatively assess the volume and effect of imports of the subject merchandise from all countries with respect to which reviews under section 751(b) or (c) were initiated on the same day, if such imports would be likely to compete with each other and with domestic like products in the United States market.

19 U.S.C. § 1675a(a)(7); Nippon Steel Corp. v. United States, 301 F. Supp. 2d 1355, 1360 (CIT 2003); see also Eveready Battery Co. v. United States, 77 F. Supp. 2d 1327, 1331 (CIT 1999); Usinor Industeel, S.A. v. United States, Slip Op. 2002-39 at 10, 2002 CIT LEXIS 41 (Apr. 29, 2002).

The ITC, however, "shall not cumulatively assess the volume and effects of imports of the subject merchandise in a case in which it determines that such imports are likely to have no discernible adverse impact on the domestic industry." 19 U.S.C. § 1675a(a)(7). Thus, the

Commission cannot "cumulate imports from any country if those imports are likely to have no discernible adverse impact on the domestic industry." Uruguay Round Agreements Act ("URAA"), Statement of Administrative Action, accompanying H.R. No. 103-826 at 883 ("SAA").

Although sunset reviews were added to the U.S. trade laws in 1994 by Congress, the ITC exercised discretion with regards to cumulation before it had a statutory basis to do so. Under the Trade and Tariff Act of 1984, Pub. L. No. 98-573, § 612(a)(2), 98 Stat. 2948, 3033 (Oct. 30, 1984) which first established guidelines for cumulation for the ITC, ITC discretion was extended to the effects of "imports from various countries that each account individually for a very small percentage of total market penetration, but when combined may cause material injury." Neenah Foundry Co. v. United States, 155 F. Supp. 2d 766, 771 (2001) (quoting H.R. Rep. No. 98-725, at 37 (1984)). With further Congressional refinement in 1987, the intent behind cumulation remained the same: "competition from unfairly traded imports from several countries simultaneously often has a hammering effect on the domestic industry [that] may not be adequately addressed if the impact of the imports are [sic] analyzed separately on the basis of their country of origin." Id. at 772 (quoting H.R. Rep. No. 100-40, part 1, at 130 (1987)). The URAA cited cumulation as a "critical component of U.S. antidumping and countervailing duty law," stating that "domestic industry can be injured by a particular volume of imports and their effects regardless of whether those imports came from one source or many sources." Id. at 772 (quoting H.R. Doc No. 103-316, vol. I, at 847 (1994)). In Neenah Foundry, the court held that the underlying purpose of cumulation thus did not change in the URAA, that the policy reasons (that cumulating small amounts of imports that collectively can hurt domestic industry) remain,

allowing the ITC discretion as to what it cumulates. Id. at 772-73.

To ensure that the no discernible adverse impact provision is satisfied, the ITC normally considers the "likely volume of the subject imports and the likely impact of those imports on the domestic industry within a reasonably foreseeable time." Usinor Industeel, S.A. v. United States, Slip Op. 2002-39 at 11-12, 2002 Ct. Int'l. Trade LEXIS 41 (April 29, 2002). The ITC must then also find that a "reasonable overlap of competition" exists between imports from different countries. Id. at 10-11 (citing Wieland Werke, AG v. United States, 13 CIT 561, 563 (1989)). Generally, the ITC needs to consider whether the similarities in the conditions of competition would prevail if the findings and orders are revoked. Id. at 11 (citing Certain Steel Wire Rope from Japan, Korea, and Mexico, USITC Pub. 3259, INV. Nos. 731-TA-547, at 11 (Dec. 1999) (five-year review)). Usinor I held that the ITC's determination with regards to the conditions of competition was supported by substantial evidence.

**1**
**The Commission Applied the "No Discernible Adverse Impact"**
**Standard In Accordance with the Statute**

The Court requested the ITC upon remand to articulate the "no discernible adverse impact" standard in five year reviews and the standard's consistency with the General Agreement on Tariffs and Trade 1994 ("GATT 1994 ") and the Agreement on Implementation of Article VI of GATT 1994 ("AD Agreement"). Usinor I, Slip Op. 2002-70 at 45.

**The Commission's Finding that A Strict Quantitative Negligibility Analysis Is Not**
**Required under U.S. Statute in Five-year Reviews Is Supported by Applicable Law**

The Commission says that a strict quantitative negligibility analysis is not required or permitted under U.S. law for five-year reviews. First, the ITC argues that, from a plain language

standpoint, the structure of 19 U.S.C. § 1677(24) (2002)[4] which defines "negligible" applies the term to original antidumping and countervailing duty investigations under 19 U.S.C. §§ 1671 & 1673 (2002), but does not refer to five-year reviews under 19 U.S.C. § 1675(c). ITC Remand Results at 5; Response of Defendant United States International Trade Commission to Plaintiffs' Comments on Remand Determination ("Defendant's Response") at 2-3.  Second, while the statute gives no guidance as to what the ITC needs to consider to fulfill the "no discernible adverse impact" standard, the Commission argues that 19 U.S.C. § 1675a (a)(7) makes contingent the cumulation prohibition in five year reviews on a determination that the imports are likely to have "no discernible adverse impact" on domestic industry.  Neither the URAA SAA nor any Congressional documents definitively define "no discernible adverse impact" as a strict negligibility test; instead, it is more of a general standard.[5]  ITC Remand Results at 7-8.

The German Producers state that they do not challenge the ITC's conclusion that a strict

_____

[4] (A) In general.

      (I) Less than 3 percent. Except as provided in clauses (ii) and (iv), imports from a country of merchandise corresponding to a domestic like product identified by the Commission are "negligible" if such imports account for less than 3 percent of the volume of all such merchandise imported into the United States in the most recent 12-month period for which data are available that precedes–

         (I) the filing of the petition under section 702(b) or 732(b), or

         (II) the initiation of the investigation, if the investigation was initiated under section 702(a) or 732(a).

[5] The ITC notes that pre-URAA the treatment of negligible imports did not include a numerical criteria, but instead involved the consideration of factors such as market share, the general frequency of sales transactions, and price sensitivity of the domestic market. See ITC Remand Results at 8; 19 U.S.C. § 1677(7)(c)(v) (1994); Neenah Foundry, 155 F. Supp.2d at 766.

quantitative negligibility test is not required for five-year reviews under U.S. statute and that the "no discernible adverse impact" standard does not equate to a strict numerical test. Comments of German Producers at 2, n. 6.

This court in Usinor I, Slip Op. 2002-70 at 11 stated that neither 19 U.S.C. § 1675a(a)(7) nor the URAA, Pub. L. No. 103-465, §220(a), 108 Stat. 4809, 4858 (1994) provided guidelines or specific numeric boundaries for defining "no discernible adverse impact." Furthermore, the Senate Report No. 103-412 at 51 (1994) concerning the URAA states that

> [t]he Committee believes that it is appropriate to preclude cumulation where imports are likely to be negligible. However, the Committee does not believe that it is appropriate to adopt a strict numerical test for determining negligibility because of the extraordinary difficulty in projecting import volumes into the future with precision. Accordingly, the Committee believes that the "no discernible adverse impact" standard is appropriate in sunset reviews.

While the court has found no indication of a particular negligibility requirement in the U.S. statute, the Commission's argument that a negligibility analysis is "not permitted," not just "not required," by law is overly broad. The URAA legislative history language referred to above states that the ITC must consider closely situations in which the level of imports is minuscule, even though it rejects an explicit quantitative test. The Commission's determination that U.S. law does not *require* a negligibility analysis is thus supported by substantial authority and persuasive reasoning.

**The ITC's Assertion that the No Discernible Adverse Impact Standard Applied without a Numerical Negligibility Standard Is Consistent with the WTO Antidumping Agreement**

The ITC argues that the issue before the Court is whether its actions are consistent with U.S. law. It asserts that the URAA is not self-executing and that 19 U.S.C. § 3512(a) states that

13

U.S. domestic law prevails in event of conflict with the World Trade Organization ("WTO")

Agreements. While conceding that judicial precedent is mixed because some courts have applied

a Chevron analysis to analyze the reasonableness of the agency's interpretation of U.S.

international obligations and other courts have applied the Charming Betsy[6] standard, the

Commission says it is unbound by these precedents because the statutory language at issue is

facially clear.

Alternately, the ITC argues that, if the court reaches the issue of its interpretation of the

consistency of U.S. statute and the WTO AD Agreement, neither the U.S. statute nor the WTO

AD Agreement, specifically Articles 3.3[7], 5.8[8], and 11[9], require a quantitative negligibility

---

[6] Murray v. Schooner Charming Betsy, 6 U.S. 64, 188, 2 Cranch 64, 2 L. Ed. 208 (1804).
The Charming Betsy case states that "[i]t has also been observed that an act of Congress ought
never to be construed to violate the law of nations if any other possible construction remains."
See also Federal-Mogul Corp. V. United States, 63 F. 3d 1572, 1581 (Fed. Cir. 1995); Jane A.
Restani & Ira Bloom, Interpreting International Trade Statutes: Is the Charming Betsy Sinking?,
24 Fordham Int'l L.J. 1533 (2001).

[7] Article 3.3 provides:

> Where imports of a product from more than one country are simultaneously
> subject to antidumping investigations, the investigating authorities may
> cumulatively assess the effects of such imports only if they determine that *(a)* the
> margin of dumping established in relation to the imports from each country is
> more than the *de minimis* as defined in paragraph 8 of Article 5 and the volume of
> imports from each country is not negligible and *(b)* a cumulative assessment of the
> effects of the imports is appropriate in light of the conditions of competition
> between the imported products and the conditions of competition between the
> imported products and the like domestic product.

[8] Article 5.8 provides:

> An application under paragraph 1 shall be rejected and an investigation shall be
> terminated promptly as soon as the authorities concerned are satisfied that there is
> not sufficient evidence of either dumping or of injury to justify proceeding with
> the case. There shall be immediate termination in cases where the authorities

14

determine that the margin of dumping is *de minimis*, or that the volume of dumped imports, actual or potential, or the injury, is negligible. The margin of dumping shall be considered to be *de minimis* if this margin is less than 2 per cent, expressed as a percentage of the export price. The volume of dumped imports shall normally be regarded as negligible if the volume of dumped imports from a particular country is found to account for less than 3 per cent of imports of the like product in the importing Member, unless countries which individually account for less than 3 per cent of the imports of the like product in the importing Member collectively account for more than 7 per cent of imports of the like product in the importing Member.

[9] Article 11, entitled Duration and Review of Anti-Dumping Duties and Price Undertakings, provides:

11.1 An anti-dumping duty shall remain in force only as long as and to the extent necessary to counteract dumping which is causing injury.

11.2 The authorities shall review the need for the continued imposition of the duty, where warranted, on their own initiative or, provided that a reasonable period of time has elapsed since the imposition of the definitive anti-dumping duty, upon request by any interested party which submits positive information substantiating the need for a review. Interested parties shall have the right to request the authorities to examine whether the continued imposition of the duty is necessary to offset dumping, whether the injury would be likely to continue or recur if the duty were removed or varied, or both.  If, as a result of the review under this paragraph, the authorities determine that the anti-dumping duty is no longer warranted, it shall be terminated immediately.

11.3 Notwithstanding the provisions of paragraphs 1 and 2, any definitive anti-dumping duty shall be terminated on a date not later than five years from its imposition (or from the date of the most recent review under paragraph 2 if that review has covered both dumping and injury, or under this paragraph), unless the authorities determine, in a review initiated before that date on their own initiative or upon a duly substantiated request made by or on behalf of the domestic industry within a reasonable period of time prior to that date, that the expiry of the duty would be likely to lead to continuation or recurrence of dumping and injury. The duty may remain in force pending the outcome of such a review.

11.4 The provisions of Article 6 regarding evidence and procedure shall apply to any review carried out under this Article. Any such review shall be carried out expeditiously and shall normally be concluded within 12 months of the date of initiation of the review.

analysis in five year reviews.  In discussing Article 3.3, the Commission says that the provision only applies to original investigations, not five-year reviews. ITC Remand Results at 17. Furthermore, the Commission claims that Article 11 does not mandate explicitly or implicitly the strict quantitative requirements of Article 5.8 and that Article 5.8 only applies to original investigations as well. ITC Remand Results at 18.  Apart from the text of the AD Agreement, the ITC points to the general purpose of five-year reviews in examining the likely future volume of imports that have been restrained for the past five years and their likely future impact on an industry that has been under protection of the remedial order. ITC Remand Results at 19.  The ITC states that

> [t]he differences in the nature and practicalities of the two types of inquiries demonstrate that the requirements for the two cannot be identical. It would not serve the distinct purpose of each type of inquiry to impose quantitative negligibility requirements applicable in the original investigation in a five-year review, which starts from the premise that the volume of subject imports may have decreased as a result of the antidumping duty order. Similarly, it would appear unlikely that the negotiators would have required a strict quantitative test in review proceedings that are inherently predictive and speculative and require the decision-maker to engage in a counterfactual analysis.

ITC Remand Results at 20.  In its Reply Brief, the ITC also discusses a WTO Appellate Body decision which, overturning a WTO Panel decision, found that "original investigations and sunset reviews are distinct processes with different purposes" and that the *de minimis* standard applied in original investigations did not apply to five-year sunset reviews. Defendant's Reply at 5-6 (citing United States – Countervailing Duties on Certain Corrosion-Resistant Carbon Flat

---

11.5 The provisions of this Article shall apply *mutatis mutandis* to price undertakings accepted under Article 8.

(internal citations omitted).

16

Steel Products from Germany, WT/DS213/AB/R, AB-2002-4 ¶ 87, 64-65 (Nov. 28, 2002) (hereinafter "Corrosion-Resistant Flat Steel Products from Germany, Report of Appellate Body")). The ITC also provided, in a submission to the court on May 24, 2004, prior to oral argument, the WTO Panel Report in United States – Sunset Review of Antidumping Duties on Corrosion-Resistant Carbon Flat Steel Products from Japan, WT/DS244/R (Aug. 14, 2003) (hereinafter "Sunset Review of Corrosion Resistant Carbon Flat Steel from Japan, Report of Panel"), and Appellate Body Report in United States – Sunset Review of Antidumping Duties on Corrosion-Resistant Carbon Flat Steel Products from Japan, WT/DS244/AB/R (Dec. 15, 2003) (hereinafter "Sunset Review of Corrosion Resistant Carbon Flat Steel from Japan, Report of Appellate Body"), which also support this proposition.

The French Producers argue that the ITC incorrectly states that there is mixed judicial precedent on the relationship between U.S. law and U.S. international obligations. They claim that the Commission is required to resort to extrinsic authority when a statute is ambiguous; this, they say, might require a resort to legislative history of the U.S. statute or even the WTO Agreements which "serve as a kind of legislative history to the URAA." Responsive Comments of Plaintiffs Usinor, Beautor, Haironville, Sollac Lorraine, and Usinor Steel Corp. to the Remand Determination of the International Trade Commission ("Comments of French Producers") at 14. They further state that Charming Betsy and its progeny of cases require the ITC to interpret U.S. statutes in conformity with international obligations in the absent of clear Congressional intent to the contrary. Id. at 14-15.

The German Producers claim that the ITC's conclusion on this issue is contrary to the Court's instructions in Usinor I because (1) this court told the Commission that it could not just

17

stress the primacy of domestic law in event of conflict with international law and (2) the existence of judicial precedent concerning the relationship between the AD Agreement and U.S. law. Comments of Plaintiffs German Producers of Corrosion Resistant Carbon Steel Flat Products on the USITC's Remand Determination of September 17, 2002 ("Comments of German Producers") at 3. They argue that judicial precedent cited by the ITC as well as the court's decision in Usinor I require the Commission and court to avoid construing U.S. law to conflict with U.S. international obligations. Id. at 4. The German Producers further argue that the AD Agreement "unambiguously" applies the 3/7 % negligibility standard to Five-Year Reviews because:

> (1) Article 11.3 provides that AD Orders 'shall be terminated' unless the authorities determine that the 'expiry of the duty would be likely to lead to continuation or recurrence of dumping and **injury**;' (2) Note 9, Article 3, provides that '**Under this Agreement**, the term **injury**, 'unless otherwise specified . . .shall be interpreted **in accordance with this Article**;' (3) Article 3.3 provides that cumulation is allowed only when 'the volume of imports from each country is not **negligible**;' and (4) Article 5.8 defines '**negligible**' as '**normally**' meaning '**less than 3 percent** of imports of the like product in the importing Member.'

Comments of German Producers at 4 (emphasis in original). They also cite United States – Countervailing Duties on Certain Corrosion-Resistant Carbon Steel Flat Products from Germany, WT/DS/213/F, Report of Panel at 177, para. 8.67 (July 3, 2002) (hereinafter "Corrosion Resistant Carbon Steel Flat Products from Germany, Report of Panel"), which stated that just because countervailing duties are five years old does not mean that the *de minimis* standard is suspended. On this basis, the German Producers argue that the identical rationale governs the negligibility standard in Sunset Reviews. Comments of German Producers at 4-5.

The Defendant-Intervenors argue that the ITC has properly found that the plain language of 19 U.S.C. § 1675a(a)(7) bars a quantitative negligibility analysis and U.S. law and the WTO

18

Agreement do not conflict on this point. Comments of Defendant-Intervenors at 1. They claim

the ITC correctly determined that the quantitative negligibility provisions of the WTO AD

Agreement, referred to by the German Producers, only apply to original investigations.

Comments of Defendant-Intervenors at 2. The domestic industry states that the WTO Panel

decision referred to by the German Producers, Corrosion-Resistant Flat Steel Products from

Germany, Report of Panel, was reversed by the WTO Appellate Body decision mentioned by the

ITC. Comments of Defendant-Intervenors at 5 (citing Corrosion-Resistant Flat Steel Products

from Germany, Report of Appellate Body, ¶ 87).

In Usinor I, the court ordered that

> [o]n remand, the Commission must address these possibilities as part of its overall
> duty to administer the antidumping laws in accordance with its international
> obligations. The Commission may ultimately conclude that departing from the
> Antidumping Agreement's numerical test is consistent with the Antidumping
> Agreement based upon the "shall normally" language. In this event, the
> Commission must discuss and explain how and why the numerical test is not
> applicable in this instance. In the alternative, the Commission must further discuss
> how and why its position is irreconcilable with the Antidumping Agreement and
> the impact of the SAA on the proper interpretation of the statute. The Commission
> may not simply disregard the Antidumping Agreement by loosely invoking court
> decisions that stress the primacy of domestic law where a conflict with
> international law arises. Rather, it must first expressly identify and analyze such a
> conflict before relying on those decisions.

Usinor I, Slip Op. 02-70 at 18.[10] Here, the ITC has construed the U.S. statute and its

_____

[10] In addressing "these possibilities," the Commission is referring to its discussion on the term "shall normally" in the AD Agreement: "It is possible that this interpretation of "normally" to mean "generally," may serve as a model for applying the Antidumping Agreement's test for negligibility. However, other than the SAA's handling of the "normally" language in the home market sales context, the court is unaware of any authority that indicates the "shall normally" language is permissive, nor did the parties provide such authority. In fact, the reverse may also be true, such that the Antidumping Agreement's numerical test for negligibility is absolute. In this event, the Commission's position would directly oppose the Antidumping Agreement." Usinor I, Slip Op. 02-70 at 17.

interpretation of the no discernible adverse impact standard consistently with the WTO AD Agreement.[11] The Commission reasonably argues that the relationship of Articles 3.3, 5.8, and 11 show that a strict quantitative negligibility requirement is applicable to original investigations and not five-year sunset reviews. Article 11 which, among other things, concerning the review of antidumping duties refers to a number of other articles in the AD Agreement, but never references the negligibility requirements in Articles 3.3 or 5.8. This seemingly explicit omission is telling; the lack of an explicit cross reference suggests that the requirement does not exist.

The court finds persuasive[12] for the proposition that this omission does not supply a negligibility requirement, the reasoning[13] of the WTO Appellate Body decisions in Corrosion-

---

[11] The Charming Betsy doctrine is not applicable here because as construed there is no inconsistency between the U.S. statute and the WTO Agreement.

[12] On the relation of WTO adjudicatory authority to statutory interpretation, see Restani & Bloom, *supra* n. 9, at 1544-47.

[13] At oral argument, ITC counsel argued that "neither the WTO Agreements nor any reports of either dispute resolution panels or the Appellate Body interpreting the WTO Agreements have any bearing in this litigation." When the court questioned the ITC regarding the supplemental opinions and WTO documents it had provided prior to oral argument, including *inter alia* Hyundai Elecs. Co. v. United States, 23 CIT 302 (1999); PAM, S.p.A. v. United States, 265 F. Supp. 2d 1362 (CIT 2003); Corus Staal BV v. United States, 259 F. Supp. 2d 1253 (CIT 2003); Timken Co. v. United States, 240 F. Supp. 2d 1228 (CIT 2002), the ITC said that it was just responding to the "arguments raised by the German respondents" and that it knows "the CIT and the Federal Circuit have in fact looked to both dispute panel reports as well as Appellate Body reports in order to confirm their analysis" and thus it felt that it was its "obligation to make . . . available to the court" such materials. When the court stated that it appeared that the ITC was citing WTO panel reports as precedent, the ITC said that "to the contrary; that was never our intention. Our view is very simple that there is absolutely no need to look to either the WTO Agreements or the WTO decisions."

The court disagrees. Its opinions may be informed by WTO documents. Hyundai Elecs. Co., 23 CIT at 312; PAM, S.p.A., 265 F. Supp. 2d at 1372; Corus Staal BV, 259 F. Supp. 2d at 1265; Timken Co., 240 F. Supp. 2d at 1238-1239. While the court understands fully that WTO Agreements are not self-executing and that WTO Panel and Appellate Body decisions are not

20

Resistant Flat Steel Products from Germany, Report of Appellate Body and Sunset Review of

Corrosion Resistant Carbon Flat Steel from Japan, Report of Appellate Body. Although the

Corrosion-Resistant Flat Steel Products from Germany concerns subsidies and countervailing

duties, Articles 11.9[14] and 21.3[15] of the WTO Agreement on Subsidies and Countervailing

Measures ("SCM Agreement") correspond closely with Articles 5.8 and 11.3 of the AD

Agreement. The WTO Panel had read the SCM Agreement to include the *de minimis* requirement

_____

*stare decisis* in United States' courts, such authority as well as treatises, law review articles, and commentaries; indeed any unforeclosed source of valuable analysis, are matters a court can examine for persuasive rationale. Nothing in the law forecloses it.

[14] Article 11.9 provides:

> An application under paragraph 1 shall be rejected and an investigation shall be terminated promptly as soon as the authorities concerned are satisfied that there is not sufficient evidence of either subsidization or of injury to justify proceeding with the case. There shall be immediate termination in cases where the amount of a subsidy is *de minimis*, or where the volume of subsidized imports, actual or potential, or the injury, is negligible. For the purpose of this paragraph, the amount of the subsidy shall be considered to be *de minimis* if the subsidy is less than 1 per cent ad valorem.

[15] Article 21.3 provides:

> Notwithstanding the provisions of paragraphs 1 and 2, any definitive countervailing duty shall be terminated on a date not later than five years from its imposition (or from the date of the most recent review under paragraph 2 if that review has covered both subsidization and injury, or under this paragraph), unless the authorities determine, in a review initiated before that date on their own initiative or upon a duly substantiated request made by or on behalf of the domestic industry within a reasonable period of time prior to that date, that the expiry of the duty would be likely to lead to continuation or recurrence of subsidization and injury. [Footnote: "When the amount of the countervailing duty is assessed on a retrospective basis, a finding in the most recent assessment proceeding that no duty is to be levied shall not by itself require the authorities to terminate the definitive duty."] The duty may remain in force pending the outcome of such a review.

in five-year reviews.  The Appellate Body reversed, noting that Article 21.3 does not explicitly mention that the *de minimis* standard of Article 11.9 be applied to five-year reviews. The Appellate Body further stated

> [w]e have previously observed that the fact that a particular treaty provision is 'silent' on a specific issue 'must have some meaning.' In this case, the lack of any indication, in the text of Article 21.3, that a *de minimis* standard must be applied to sunset reviews serves, at least at first blush, as an indication that no such requirement exists.

Corrosion-Resistant Flat Steel Products from Germany, Report of Appellate Body , ¶ 65.  While the Appellate Body stated that the silence did not exclude the inclusion of a *de minimis* requirement through implication, it found through its analysis of the text of the SCM Agreement that such a requirement could not be implied for five-year reviews.  Similarly, in Sunset Review of Corrosion Resistant Carbon Flat Steel from Japan, Report of Panel, the WTO Panel said that

> [o]n its face, Article 11.3 does not provide, either explicitly or by way of reference, for any *de minimis* standard in making the likelihood of continuation or recurrence of dumping determinations in sunset reviews. Therefore, Article 11.3 itself is silent as to whether the *de minimis* standard of Article 5.8 (or any other *de minimis* standard) is applicable in sunset reviews.

¶ 7.67 (internal citations omitted).  While the negligibility issue was not appealed in Sunset Review of Corrosion Resistant Carbon Flat Steel from Japan, Report of Appellate Body, the Appellate Body does draw a distinction between the nature of original investigations and sunset reviews. See Sunset Review of Corrosion Resistant Carbon Flat Steel from Japan, Report of Appellate Body, ¶¶ 106-07.  This reasoning is persuasive because original investigations and five-year reviews are distinct in nature and have different purposes: the former contains a negligibility requirement because it is required to yield precise results, while the latter is predictive and speculative which requires a counter-factual analysis.

22

It, thus, appears that the Commission's interpretation of U.S. law as not requiring a strict quantitative negligibility analysis is not inconsistent with the WTO AD Agreement. The ITC's determination that U.S. law and the WTO AD Agreement are not in conflict is thus in accordance with the law.

**2**
**The ITC's Findings of Likely Discernible Adverse Impact with Respect to French and German Subject Imports Are Supported by Substantial Evidence and Are in Accordance with Law**

In Usinor I, this court instructed the ITC to reconsider its no discernible adverse impact findings regarding subject imports from France and Germany, particularly its findings of likely volume increases. The court required the Commission to take into account partial year 2000 data on capacity utilization rates for French and German CRCS or if the Commission chose not to do so, to explain why. Further, the court required the ITC to consider the French and German Producers' claims that they would not be able to increase exports to the U.S. upon revocation of the order because of the high capacity utilization as well as their commitment to the EU market.

With regards to the likely[16] discernible impact standard, there are no statutory or SAA

---

[16] The court in Usinor I ordered that

> [r]esort to dictionary sources Webster's Dictionary and Black's Law Dictionary demonstrates that "likely" is tantamount to "probable," not merely "possible." See Webster's Ninth New Collegiate Dictionary, at 692 (1990); Black's Law Dictionary (6th ed., 13th reprint) at 834 (1998). Under the standard articulated in Chevron, the court concludes that the meaning of the term is clear and terminates its inquiry there.
>
> Certainly, as the SAA says, multiple "likely" outcomes are possible under the statute. The Commission, however, must demonstrate that its interpretation of the evidence is one of them. The Commission, relying solely on the above passage in support of its meager discussion of the Plaintiffs' evidence, does not demonstrate how its understanding of the impact and scope of potential future

23

guideline about what constitutes "no discernible adverse impact." Without Congressional

guidance, the ITC considers "likely volume of the subject imports and likely impact of those

imports on the domestic industry within a reasonably foreseeable time." Usinor Industeel, S.A. v.

United States, Slip Op. 2003-118 at 8, 2003 Ct. Int'l Trade LEXIS 116 (Sept. 8, 2003).

An adverse impact may be discernible, yet may not cause material injury because

"material injury" is defined as "harm which is not inconsequential, immaterial or unimportant."

19 U.S.C. § 1677(7)(A). "[T]he substantial evidence necessary to support an affirmative material

injury determination is greater than that necessary to find there will not likely be no discernible

adverse impact from imports of a particular country." Id. at 11. Thus, the statutory bar for

finding no discernible adverse impact is lower than that for ascertaining material injury. Id.

---

> imports are more than one possibility, as opposed to one of likelihood, among
> many. The court remands the matter to the Commission to determine, in the
> manner required by law, whether the recurrence or continuation of injury is likely,
> based on a more complete explanation of its findings.

Usinor I, Slip Op. 2002-70 at 43-44.

The Remand Determination was unclear and confusing:

> For purposes of the Commission's determinations on remand in these reviews, we
> follow the Court's instructions to apply the meaning of "likely" as "probable." To
> the extent the Court used "probable" to impute a higher level of certainty of result
> than "likely," we also apply that standard but only for purposes of this remand, as
> previously we have found such a standard to be inconsistent with the statutory
> scheme as a whole.

ITC Remand Results at 2, n.3. The ITC thus implied that it was, despite the court's order,
treating the word "likely" as meaning something other than "probable." The Commission,
however, later stated that it "followed the Court's instructions by opinion and order dated July
19, 2002, to apply the meaning of 'likely' as 'probable." Letter from Marilyn R. Abbot,
Secretary, United States International Trade Commission, to The Honorable Evan J. Wallach,
Judge, United States Court of International Trade (July 9, 2003).

24

The ITC once again found that the record evidence did not support the conclusion that French and German subject imports were likely to have no discernible adverse impact on the domestic industry if the orders were revoked. ITC Remand Results at 21. The ITC states that its no discernible adverse impact analysis centers on the subject imports from each country and the likely impact of those imports on the domestic industry within a reasonably foreseeable time were the orders revoked. ITC Remand Results at 20. The ITC says that it interprets the no discernible adverse impact provision to be an exception to the ITC's ability to cumulate imports in five-year reviews:

> [t]he statute uses the phrase "no <u>discernible</u> adverse impact." In other words, the issue is whether imports will have no "noticeable" or "detectable" adverse impact. In applying this standard, it would be inappropriate to consider whether imports are likely to have a "significant" adverse impact, which is appropriate for the ultimate analysis of whether the domestic industry is likely to be materially injured if the order is revoked. The use of the low "discernible" threshold indicates that Congress did not intend for the Commission to conduct a complete likely material injury analysis, or even an abbreviated one; rather, we understand the provision as essentially requiring us to identify those subject countries that are unlikely to present any identifiable harm to the domestic industry such that they should be removed from the possibility of being cumulated with other subject countries.

ITC Remand Results at 21 (emphasis in original).

In the Remand Determination, the ITC has correctly determined that imports from France and Germany are not likely to have no discernible adverse impact on the domestic industry were the orders to be revoked.

**a**
**French Producers**

The court in <u>Usinor I</u>, Slip Op. 2002-70 at 22-24, required the ITC to do a French country-specific analysis, and consider capacity utilization and the partial-year 2000 data in

25

concluding that the likely discernible adverse impact test had been met for the French Producers.

The French industry's capacity utilization rates for CRCS were [a percentage] in 1997, [a percentage] in 1998, [a percentage] in 1999, and [a percentage] in January-March 2000. ITC Remand Results at 24. The ITC discusses the French producers' inventories which totaled [a number] short tons in 1999; combined with [a number] short tons of unused French production capacity in 1999, French production was [a number] short tons equivalent to [a percentage] of U.S. production and [a percentage] of apparent U.S. consumption in 1999. ITC Remand Results at 24. The Commission says that the volumes are particularly significant given that the "applicable standard is whether subject imports are likely to have no discernible adverse impact." ITC Remand Determination at 24 (emphasis in original).

Though the ITC concedes that a [a percentage] capacity utilization is a barrier to increased production, it claims that the French producers have presented numbers which are higher than [a percentage], meaning that [a percentage] does not equal full production capacity. Defendant's Response at 8. Thus, for example, while the French Producers did report [a percentage] capacity utilization in the January-March 2000 period, the difference compared to the same period in the previous year can be attributed to higher levels of exports. ITC Remand Results at 25. Thus, while the ITC "considered the reported level of capacity utilization for the first three months of 2000, [they did] not place decisive weight on partial year data, particularly in light of the full year trends in French capacity utilization rates which show a continuing decline." ITC Remand Results at 25.

The ITC also asserts that the French producers' ability to maintain such a high capacity-utilization is due to its heavy reliance on its export market. ITC Remand Results at 24;

26

Defendant's Response at 8. The ITC supports this claim by stating that a large increase in imports occurred in 1990-1992, despite the high capacity utilization rates. ITC Remand Results at 22; Defendant's Response at 7. After the order was put in place, imports from France fell dramatically, but were still existent showing the presence of certain channels of distribution left open into the U.S. ITC Remand Results at 23; Defendant's Response at 7. This is despite the fact that the French corrosion-resistant steel industry is relatively large and modern with capacity which has doubled from 1992–1999. The ITC claims that the "French industry is more capable now of participating in the U.S. market in a meaningful way than it was during the period examined in the original investigations." ITC Remand Results at 23-24.

Additionally, the ITC rejected the French Producers' arguments that their current position as a net importer of CRCS demonstrated their inability to meet even the demands of the French market, finding that the situation reflected a conscious business decision to pursue export markets at the expense of their domestic market. Defendant's Response at 8-9. The ITC found market softening, especially with the slowing of the German auto industry output, in turn having the possibility of increasing exports to the U.S. and increasing competition within Europe. Overall, the French Producers may have had difficulty filling orders because of historically high demand, but the ITC did not believe that the strong demand would continue unabated or that the French Producers would be the only ones able to satisfy the demand. Defendant's Response at 10.

The ITC found that French imports undersold the domestic like product in about one-half of the price comparisons. ITC Remand Results at 23. The ITC states that the data to confirm the assertion that U.S. prices for the French product were considerably higher than the domestic like

27

product and thus unlikely to cause increased imports is unavailable and the recent average unit values (AUVs) are not probative given a likely different product mix. ITC Remand Results at 27. The ITC claims that it would not be surprised if there was a concentration in higher value products due to the AD/CVD duties and "in the original investigations, there was evidence of underselling by the French subject product, which [it found] likely to occur if the orders were lifted." ITC Remand Results at 28. Overall, the ITC noted the

> French industry's substantial production capacity and unused capacity relative to U.S. production and apparent U.S. consumption, its available inventories, its reliance on exports including exports to non-EU countries, the substitutability of the French product with the domestic like product, and the French subject producers' trade patterns during the original investigations. Based on these facts and in light of the finding in the review determination of the vulnerability of the domestic industry, [the ITC did] not find that the likely subject imports from France would be likely to have no discernible adverse impact on domestic industry if the orders were revoked.

ITC Remand Results at 28.

The French Producers state that, since 1993, due to a [a percentage] increase in French demand and an [a percentage] increase in EU demand, they have been operating at above [a percentage] capacity utilization levels. Because they have not been able to keep pace with the significant growth in demand, the French CRCS's inventory levels have been declining and the Producers have been having difficulty meeting customer orders; France is now a substantial and growing net importer of CRCS. Comments of French Producers at 4. The French Producers deemed that in order to deal with the increased EU demand, they purchased Beautor and Haironville, companies which have never sold their products in the U.S. market, and have divested their sole U.S. facility which processes CRCS. As a result, they claim they are the largest CRCS suppliers to the EU market at [a percentage] compared with less than that of [a

28

percentage] in the U.S. market. Comments of French Producers at 5. Furthermore, they claim that supply has tightened as a result of the new EU recycling laws requiring all the weight of vehicles and appliances (including that of non-metal components) be recycled will increase the demand for easily recycled CRCS. This, they claim, has caused a substantial increase in the percentage of CRCS in European cars and appliances. Comments of French Producers at 6.

While the French Producers point out that the ITC claimed that there was an [a percentage] increased in French capacity, they argue that the ITC failed to consider the [a percentage] increase in EU demand. Comments of French Producers at 7. The French Producers also claim that the ITC bases its argument of excess capacity solely on 1999, the only year when the French producers were not operating at full capacity, and ignored the end of the POR (the first quarter of 2000) when capacity utilization was over [a percentage]. Comments of French Producers at 7-8. They claim that the ITC also failed to consider that the French Producers had to request customers to cancel orders due to overwhelmed capacity and they could not increase their exports because they were already at full capacity. Comments of French Producers at 8. Finally, the French Producers claim that the ITC based its market softening theory on what the Court labeled as "speculative theories" – unsubstantiated evidence citing lack of growth (which admittedly was lower, but was still growth). Comments of French Producers at 8 (citing Usinor I, Slip Op. 2002-70 at 22-23).

The Defendant-Intervenors support the Commission's conclusion that the record does not support the conclusion that French subject imports are likely to have no discernible adverse impact on domestic industry if the orders are revoked. They claim that the volume of French imports increased from [a number] NT in 1990 to [a number] NT in 1992 even though capacity

utilization was at [a percentage] at the beginning of the period; French imports continued to enter the U.S. despite the orders; the French Producers are heavily dependent on export markets with total exports to all countries other than the U.S. accounting for [a percentage]; and inventory and unused production during the POR was equivalent to [a percentage] of U.S. consumption. Comments of Defendant-Intervenors at 6-7. Furthermore, they claim that the Commission acknowledged rightly that [a percentage] capacity utilization might not actually equal [a percentage] full production capacity. Comments of Defendant-Intervenors at 7. They argue that the ITC was right to conclude that France was a significant exporter even though it was a net importer and that the French producers's argument that they had to cancel orders due to overwhelmed capacity was weak as it was outside the POR. Comments of Defendant-Intervenors at 8.

The court upholds the ITC's determination with regards to the no discernible adverse impact analysis and the French Producers. Sunset reviews are factual, case-by-case determinations and need only be supported by substantial evidence. See Nippon Steel, 301 F. Supp. 2d at 1360; Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 936 (Fed. Cir. 1984).

On remand, the ITC explained that it did a country-specific analysis of the French Producers' production capacity and unused capacity, inventories, reliance on exports, substitutability with the domestic like product, and the overall French trade patterns during the original investigation. Additionally, while the French Producers' capacity utilization was high, leaving, as the ITC says, limited room for increasing capacity, the French capacity utilization rates above [a percentage] in 1997, 1998, and January-March 2000 show that [a percentage] was

30

not a ceiling. In this context, and in light of the Commission's conclusion regarding the "weakened" state of U.S. domestic industry which was upheld by this court in Usinor I, Slip Op. 2002-70 at 33-36, any small increase in capacity that could be translated into increased exports to the U.S. meets the no discernible adverse impact standard. Such an increase in exports which coincided with increased capacity utilization was evidenced in the Commission's analysis of the interim 2000 data as compared with the same period in 1999. See ITC Remand Results at 25.

The ITC has also provided adequate support for its rationale of why it afforded less weight to the interim 2000 data. The ITC argued that increased capacity utilization rates in interim 2000 over the same period in 1999 can be attributed to higher exports in 2000 period. Furthermore, this focus on available capacity, says the ITC, overlooks the French Producers' export patterns and ability to shift production to export markets. The Commission can decide to exercise its discretion to weigh evidence from different time periods and determine which is more probative of threat of injury. Companhia Paulista De Ferro-Ligas v. United States, 20 CIT 473, 483 (1996); see Metallverken Nederland B.V. v. United States, 14 CIT 481, 484 (1990). Given the standard of review, the ITC's conclusion that the likely subject imports from France would not be likely to have no discernible adverse impact on domestic industry were the orders to be revoked is both adequate and supported by substantial evidence.

**b**
**German Producers**

With respect to the German Producers, the Court instructed the ITC on remand to consider the German Producers' evidence of increased capacity utilization during the latter half of 2000 and their objections to the argument that their mills would be operating at full capacity for the foreseeable future. The ITC concluded, as it had originally, that the likely subject imports

31

from Germany are not likely to have no discernible adverse impact on the domestic industry.

ITC found that since the orders, subject imports declined by 82%. ITC Remand Results at 28. Though there was a decline, the ITC claims that the continuing presence of the imports show that channels of distribution remained – particularly since the German subject product is generally substitutable and competitive with the domestic like product. ITC Remand Results at 28-29. Like the French Producers, the German industry is relatively large and the producers themselves forecasted additional capacity to be available by 2000-2002. ITC Remand Results at 29; Defendant's Response at 18. The ITC stated that "these facts undercut the arguments of the German respondents that subject imports are not likely even to have a *discernible* adverse impact." ITC Remand Results at 29.

The ITC found that following the imposition of the orders, the decrease in imports of German carbon corrosion-resistant steel was replaced by a "substantial" increase in imports of microalloy corrosion-resistant steel. ITC Remand Results at 29; Defendant's Response at 19. Despite this, the ITC claims that the Germans still have an interest in increasing their exports of carbon steel. ITC Remand Results at 29-30. The German producers, like the French, had high capacity utilization rates in the POR and, as per the Court's instructions, the ITC examined the capacity utilization data for 2000, particularly the last two quarters of 2000. ITC Remand Results at 30-31. The ITC found high capacity utilization, but did not put much emphasis on this data because the reports were inconclusive as to whether the German producers will be operating at full capacity in the reasonably foreseeable future. Prehearing Brief on behalf of German

32

Producers, Vol. II at 66 ("Leitner Report")[17]; Appendix to Response of Defendant United States International Trade Commission to Plaintiffs' Comments on Remand Determination at C90 ("Defendant's Appendix); ITC Remand Results at 31; Defendant's Response at 21. It also stated that customer orders do not necessarily translate into concrete orders and the production capacity in Germany and the EU grew rapidly in 2000, and additional German capacity coming on line in 2001-2002 will have increased the ability of German Producers to fill more orders. ITC Remand Results at 31-32.

The capacity utilization rates reported to the ITC for the first quarter of 2000 were [a percentage] compared with [a percentage] for interim 1999. ITC Remand Results at 31. Furthermore, the German producers built up large home market and U.S. inventories in 1999-2000 and the ITC argues that this undermines their claim that they could not expand their sales to the U.S. market. ITC Remand Results at 32.

The German Producers claim that the ITC failed to follow the court's directions and again ignored the evidence. In particular, they claim that, from April to September 2000, they submitted evidence showing the existence of capacity constraints for the foreseeable future that would preclude increased German exports to the United States. Comments of German Producers at 6. They argue that the evidence presented shows that the capacity was so restrained in 2000 that they turned down new orders and customers and both mill inventories and steel service center stocks were at low levels. Comments of German Producers at 6. The German Producers disagree with the Commission's argument concerning the uncertain nature of the orders

---

[17] The Leitner Report states that the capacity utilization rates were compiled from questionnaire responses which collected only first quarter 2000 data. See Defendant's Appendix at 66.

translating into uncertainty of the German Producers operating at full capacity. They claim that their intention to operate at full capacity was not linked with orders as of June 2000 and that the Commission did not meet the requisite "probability" standard by arguing that the order 'may be canceled or delayed" – this was a mere "possibility." Comments of German Producers at 7. The German Producers also argue that the Commission erred in suggesting that significant growth in German capacity in 2000, scheduled to come on line in 2001-2002, would allow German mills to increase exports to the U.S., particularly since the increases were factored into the submissions they made to the Commission in September - October 2000. Comments of German Producers at 7. They further point to independent studies which show that the capacity in 2001-2002 was increased to meet higher German and EU demand and that any shortages were not the result of a fire in one of the plants, but rather due to the demand. Comments of German Producers at 7-8.

The German Producers argue that the ITC's determination that its imports met the no discernible adverse impact standard is in error. They argue that the Commission, by relying on the year end 1999 data when it should have considered the evidence closest to "vote day," did not follow the court's instructions. They also claim that the Commission's conclusion that the excess inventories would be likely directed to the U.S. market is erroneous because, first, inventories were at normal levels, and, second, inventories had no relevance to projected sales to the U.S. because "German mills have never sold steel to the United States from their home market inventories." Comments of German Producers at 13. The German Producers state that the claim regarding their heavy reliance on export markets is unsubstantiated and that because of product shifts, CRCS production and shipments are likely to decline because of the shift to microalloy. Comments of German Producers at 13-14. Finally, they say, revocation of the order

34

will not lead to an increase of imports because German CRCS imports account for [a percentage] of total subject CRCS imports and [a percentage] of U.S. CRCS consumption. German CRCS steel has, they say, before and after the orders, been confined to automotive steel by one company, TKS; the volume of German CRCS sold in the U.S. has remained constant to the 1990s because of the shift in demand to microalloy. Thus, they conclude, microalloy imports have not increased to injurious levels and American customers are unlikely to replace microalloy with CRCS in the foreseeable future. Comments of German Producers at 14-15.

With regard to the German Producers, the Defendant-Intervenors also argue that the Commissions's discernible adverse impact finding was supported by substantial evidence. They argue in support of the evidence the ITC used to conclude that order may be delayed or cancelled, the nature of the temporary shortages; and the increase in capacity translating into U.S. exports. Comments of Defendant-Intervenors at 9-10. They also support the ITC's findings with regard to the effect of increased inventories, product shifting between CRCS and microalloy, and that fact that despite the orders, the German Producers still exported a significant volume into the United States. Comments of Defendant-Intervenors at 11-12.

The ITC discussed a number of factors that addressed the court's concerns about capacity utilization in Usinor I, Slip Op. 2002-70 at 24-25. The ITC pointed to the increase in micro-alloy corrosion resistant steel imports from Germany ([a percentage] of U.S. shipments in 1992 to [a percentage] in 1999), the capacity for which can be used to produced the subject merchandise. ITC Remand Results at 29. The combination of CRCS and microalloy capacity totaled over [a percentage] of U.S. domestic consumption in 1999 and substantial additional capacity was coming on line in 2000-2002, as reported by the German Producers. Id. Just as in the case of the

35

French Producers, the ITC acknowledged that increased production is limited by high capacity utilization. Yet, despite high capacity utilization in the original investigation, the German Producers shipped increasing volumes of LTFV imports to the U.S. Also, German inventories in 1999 combined with unused production capacity amounted to [a number] short tons, equal to [a percentage] of U.S. production and [a percentage] of U.S. consumption.

Finally, the ITC addressed the 2000 capacity utilization data which the court had instructed it to consider: the capacity utilization during the last two quarters of 2000 and projections that German capacity would be strained for the foreseeable future with no additional imports to the U.S. With regards to the 2000 capacity utilization figures, the Commissions cites the Leitner Report which, although it showed the German Producers operating at full capacity in 2000, was based on questionnaire responses based on first quarter data. Though the capacity utilization rates for the first quarter of 2000 were [a percentage] compared to [a percentage] in the corresponding period in 1999, the ITC determined that the first quarter 2000 figures showed considerable excess capacity in relation to U.S. production and U.S. consumption. ITC Remand Results at 31. With regards to the projections of German capacity for the foreseeable future, the ITC decided not to rely on the number of orders on the books of the German Producers, as it believed that orders do not necessarily translate into production. And, the higher capacity in Germany in 2000 and the possibility of even more in 2001-2002 increased their ability to fill orders. Moreover, with projections of higher inventories and the fact that many German producers did not expect capacity utilization to rise above [a percentage], the ITC discounted the German Producers' claims that they would not be able to expand sales to the U.S. market because they were turning down customers and delaying plant maintenance due to strained

36

capacity. Id.

The ITC's determination that the likely subject imports from Germany would be likely to have no discernible adverse impact on U.S. industry if the orders were revoked is supported by substantial evidence. "It is within the Commission's discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor or piece of evidence." Maine Potato Council v. United States, 9 CIT 293, 300 (1985). The ITC has thus properly exercised its discretion in choosing the data on which it based its conclusion.

**c**
**The Commission's Conclusion Concerning the Impact of EU Integration on the Subject Imports Is Supported by Substantial Evidence**

The court in Usinor I directed the ITC to examine whether the changes in the EU since the original investigation affected the likelihood that increases in imports would occur upon revocation. Slip Op. 2002-70 at 39-40. The ITC affirmed its findings from the Review Determination. It again dismissed the European Producers' arguments that an increased focus on the EU market due to integration made less likely increased exports to the U.S. upon revocation. The ITC

> reiterat[ed] [its] conclusion from [the Review Determination] that the additional integration and expansion that occurred as a result of the formation of the European Union could have the potential to increase the intra-EU marketing of subject products from France and Germany and thereby reduce to some degree these countries' exports to the United States compared to the original investigations. However, substantial integration had already taken place by the time of the original investigations in 1992 and 1993. Such pre-existing integration did not prevent France and Germany from exporting the increasing volumes of subject merchandise to the United States at that time.

ITC Remand Results at 34. The Commission, in examining the German and French Producers' intra-EU exports, found that there were increases after 1994 and 1995, the years after the

imposition of the respective orders, but generally the percentage of sales to these export markets varied little from 1990-1999; this was despite the EU's Single European Act of 1986, the Maastricht Treaty of 1992, and the accession of Sweden, Finland, and Austria in 1995. ITC Remand Results at 33-35. Furthermore, WTO data indicated that iron and steel extra-EU exports have increased not decreased during the time. ITC Remand Results at 35.

The Court instructed the ITC to consider the French and German Producers' arguments that increased integration has made the EU their home market in light of Stainless Steel Plate from Sweden, Inv. No. AA1921-114 (Review), USITC Pub. 3204 (July 1999) and Pressure Sensitive Plate from Italy, Inv. No. AA1921-167 (Review), USITC Pub. 3157 (Feb. 1999). Usinor I, Slip Op. 2002-70 at 39. The ITC originally "acknowledge[d] that the French and German producers' relationship with Europe could have the potential to reduce to some degree likely exports compared to the original investigations." ITC Remand Results at 36. The Commission, however, found there were "sufficient other factors such that we do not conclude that subject imports from France and Germany are likely to have no *discernible* adverse impact." ITC Remand Results at 36-37 (emphasis in original).

The German Producers argue that the Commission has not abided by its precedent in discounting the significance of EU integration on German capabilities. Comments of German Producers at 8. They had produced evidence to the ITC that they would not sacrifice their long term relationship with EU customers by increasing significantly exports to the U.S. upon revocation of the orders; from 1990-1999 about [a percentage] of German CRCS sales were sold to customers within the EU (including Germany); the German Producers anticipated their sales to other EU members would increase between 1999-2002; and the opening of the EU market in

38

1993 and the introduction of the Euro in 1999 would provide a focus on the EU market. Comments of German Producers at 9.

The German Producers claim that some additional factors make the ITC's determination regarding the effects of EU integration erroneous. First, the fact that intra-EU exports varied little between 1990-1992 and 1993-1999, respectively, actually shows that the German Producers are not export-oriented as the EU market has provided a stable, market for German CRCS producers. Second, they argue that for the ITC to assert that German CRCS shipments to other EU nations declined between 1997-1999 is disingenuous as the record evidence exhibits that CRCS shipments are being replaced with microalloy corrosion resistant steel. Third, the German Producers also argue that the ITC has erroneously discounted the significance of the Single Market and the Euro. Fourth, the Commission's use of EU wide export rates for "all iron and steel products" through 1998 does not constitute substantial evidence as to why German intra-EU CRCS shipments should be combined with German third country CRCS shipments in evaluating whether they are export oriented. Comments of German Producers at 12. Fifth, the Commission's reliance on the volume of extra-EU exports is immaterial as it constitutes less than [a percentage] of total German shipments and less than [a percentage] of U.S. consumption. Comments of German Producers at 12.

The French Producers argue that the ITC has failed to meet the no discernible adverse impact standard with respect to EU integration and increasing imports. They claim that the Commission's assertions of excess capacity and available inventories

> even if taken as true, at most simply show that it might be 'possible' for the French Producers to increase their exports. The Commission, however, does not even attempt to provide any cogent rationale why the French Producers would be *likely* to use any available CRCS to increase their meager level of U.S. sales

39

instead of augmenting their robust sales in the EU market. Comments of French Producers at 10. The French Producers further opine that the ITC's conclusion of "likely" increase of exports to the U.S. market hinges on the "heavy reliance . . . on export markets" as if high sales to the EU market somehow suggests a likelihood of increased exports to the U.S. market. Comments of French Producers at 11. They dispute that with [a percentage] of the EU market that they would abandon their established European customers to increase their [a percentage] share of the U.S. market. Comments of French Producers at 12. And, while the ITC claims that the French Producers sell a "considerable volume" of exports to non-EU countries, [a percentage] of their production is sold within the EU, leaving only [a percentage] for the remaining markets. Comments of French Producers at 12.

The Defendant-Intervenors support the Commission's determination that the French and German Producers' purported focus on the EU market would not lead to curtailed imports so as to meet the no discernible adverse impact test. They stress that the percentage of shipments by the German producers to the EU market has not increased since the original investigation, substantial EU integration had happened prior to the original investigation, iron and steel exports by EU members for ports outside the EU increased affecting all steel products, and the significant volume of the German non-EU exports shows their export-oriented nature. Comments of Defendant Intervenors at 12-13. With regards to the French Producers, the Defendant-Intervenors claim that the fact that [a percentage] of French Production during the POR went toward all exports (excluding the U.S.) shows that they remain export oriented. Comments of Defendant Intervenors at 13-14. In addition, they argue there is limited precedential value to sunset reviews, as indicated in <u>Ugine-Savoie Imphy v. United States</u>, 248 F. Supp. 2d at 26-27,

40

which states that each case is unique and needs to be decided on a case-by-case basis.

The ITC's conclusion that EU integration would not affect the likelihood of increased exports for the French and German Producers is supported by substantial evidence. The ITC found that most of the EU integration which had taken place by the time of the original investigation in 1992 and 1993 did not prevent the increase in exports, particularly since the largest increase in intra-EU exports occurred in 1994 and 1995 just after the imposition of the orders. This is telling due to the considerable portion of integration that had occurred as per the Single European Act and the Maastricht Treaty and the implication that the orders and not EU integration increased both EU Producers' intra-EU focus. Although the EU Producers claim that the EU is their primary market, the data the ITC cites shows that extra-EU exports have actually increased from the time of the original review and the sunset review.

The ITC was within the bounds of its discretion in concluding that the German and French Producers cannot claim the EU as their home market, despite its previous determinations in Stainless Steel Plate from Sweden and Pressure Sensitive Plate from Italy. The Commission must consider the many economic variables unique to each review and there is limited precedential value to previous reviews because the Commission is not required to make identical determinations in each, and it must consider each subject import and the circumstances of each investigation *sui generis*. See Usinor I, Slip Op. 2002-70 at 64; Timken Co. v. United States, Slip Op. 2004-7 at 32, 54-55, 2004 CIT LEXIS 17 (Feb. 25, 2004); Armstrong Bros. Tool Co. v. United States, 84 Cust. Ct. 102, 115 (1980); see also Citrosuco Paulista, S.A. v. United States, 12 CIT 1196, 1209 (1988). The ITC states that it considered the French and German Producers' relationship to the EU market and the potential for this to affect likely imports to the United

41

States, but found the aforementioned evidence to fulfill the no discernible adverse impact standard. The ITC's conclusion that the French and German Producers' EU focus would not be likely to have no discernible adverse impact is supported by substantial evidence.

Because the Commission's interpretation and application of the no discernible adverse impact standard is supported by substantial evidence and is in accordance with the law, this exception to cumulation under 19 U.S.C. § 1675a(a)(7) does not apply. Therefore, the ITC's exercising of its discretion to cumulate French and German imports with those of Australia, Canada, Japan, and Korea is supported by substantial evidence and is in accordance with law.

**B**
**The ITC's Determination that Revocation of the Orders on Subject Imports Is Likely to Cause the Continuation or Recurrence of Material Injury Within a Reasonably Foreseeable Time Is Supported by Substantial Evidence**

In sunset reviews, after deciding whether to cumulate, the ITC is required to

> determine whether revocation of an order . . . would be likely to lead to continuation or recurrence of material injury within a reasonably foreseeable time. The Commission shall consider the likely volume, price effect, and impact of imports of the subject merchandise on the industry if the order is revoked . . . .

19 U.S.C. § 1675a(a)(1); see Ugine-Savoie Imphy, 248 F. Supp. 2d at 1210. In carrying out this analysis,

> [t]he determination called for in these types of reviews is inherently predictive and speculative. There may be more than one likely outcome following revocation or termination. The possibility of other likely outcomes does not mean that a determination that revocation or termination is likely to lead to continuation or recurrence of dumping. . . is erroneous, as long as the determination of the likelihood of continuation or recurrence is reasonable in light of the facts of the case. In such situations, the order or suspended investigation will be continued.

SAA, P.L. 103-465, at 883 (1994). Sunset reviews are prospective in nature which lends to the use of counter-factual analysis to fulfill the "likelihood" standard, which is a lower standard than

that required for a material injury analysis. Id. at 883-84.  The ITC must "decide the likely impact

in the reasonably foreseeable future of an important change in the status quo – the revocation of

an order or termination of a suspended investigation and the elimination of the restraining effects

of that order or suspended investigation on volumes and prices of imports." Id. at 884.  To come

to its conclusion, the ITC is required to take into account

>
> (A)     prior injury determinations, including volume, price effect, and impact of imports of the subject merchandise on the industry before the order was issued . . . ,
> (B)     whether any improvement in the state of the industry is related to the order . . . ,
> (C)     whether the industry is vulnerable to material injury if the order is revoked . . . , and
> (D)      in an antidumping proceeding under section 1675(c) of this title, the findings of the administrative authority regarding duty absorption under section 1675(a)(4) of this title.

19 U.S.C. § 1675a(a)(1).

In Usinor I, Slip Op. 2002-70 at 36-42, the court required that the Commission reconsider

its findings regarding volume, price, and impact of the cumulated imports as the findings were

not supported by substantial evidence.  The court also directed the Commission to determine in

accordance with the law whether the recurrence or continuation of injury to domestic injury is

*likely* based on a more thorough explanation of its findings. Usinor I, Slip Op. 2002-70 at 43-44.

**1**
**The Commission's Findings Regarding Likely Volume of Subject Imports Are Supported by Substantial Evidence**

The ITC reaffirmed its finding in the initial review determination that the volume of

cumulated subject imports likely would be significant within a reasonably foreseeable time if the

orders were revoked. In the original investigation, the cumulated volumes of the subject imports from France, Germany, Australia, Canada, Japan, and Korea went from 1.5 million short tons in 1990 to 1.4 million tons in 1991, to 1.9 million tons in 1992. ITC Remand Results at 39. The increase in cumulated subject imports corresponded to a significant increase in market share for the subject imports: the cumulated imports' market share rose from 11.7% in 1990 to 12.3% in 1991 to 14.4% in 1992. Id. The imports "fell substantially" upon imposition of the orders and have remained "at levels significantly below the pre-order level during the period of review." Id.

In the remand, in support of its conclusion, the Commission found that there was considerable capacity to produce CRCS in the subject countries which was greater than U.S. domestic consumption during the period of review; this was vital information, since the additional capacity directed to produce the non-subject corrosion-resistant steel could be used to produce CRCS. Id. at 39-40. Also, although it found that available capacity varied among the six subject countries, the Commission determined that on a "cumulated basis the subject countries had significant available capacity." Id. at 40. Moreover, the Commission states that

> given the high fixed costs associated with corrosion-resistant steel production, there is an incentive to maximize the utilization of available capacity. Furthermore, we again find that subject producers' inventories of the subject merchandise were fairly substantial and that there is a particular incentive to produce and sell more [CRCS] because it is among the highest value-added carbon steel products and therefore provides higher returns than many other carbon steel products.

Id. The ITC further found heavy reliance on export markets by the CRCS producers and an increased share of the U.S. market captured, despite the imposition of the orders. Id. Despite the potential for further EU integration to reduce some of the exports, the Commission found that significant cumulated volumes of subject imports are likely within a reasonably foreseeable time

44

if orders are revoked.

Because the court finds that the Commission's determination regarding capacity utilization, no discernible adverse impact, and EU integration and thus cumulation are supported by substantial evidence, the court finds the Commission's volume findings similarly are sufficiently supported by substantial evidence and are in accordance with the law.

**2**
**The Commission's Determination About Likely Price Effects of Subject Imports Is Supported by Substantial Evidence**

The ITC adopted the findings in the Review Determination "that the significantly increased volumes of cumulated subject imports likely would undersell the domestic like product to a significant degree, leading to significant price depression and suppression, within a reasonably foreseeable time." ITC Remand Results at 41. The Commission stated that it had "reexamined the record, and [has] taken special note of the underselling, price suppression, and price depression evidenced on the record of the original investigation. Id. Based on these findings, the ITC found that the "pricing trends over the current period of review differ[ed] among the several products, although in general prices were somewhat lower in 1999 than in 1997. The pricing data show a mixture of under- and over-selling by subject imports even with orders in place" Id. Because the subject imports were sold primarily through contracts and spot market sales, the ITC finds that this would likely continue upon revocation of the orders:

> [i]n both the contract and spot markets, given the general interchangeability of the subject imports with the domestic like product, price is an important factor in purchasing decisions. As stated in the review determinations, prices in the spot market could affect prices in the domestic industry's contract business, but contracts may provide some measure of insulation from spot market price fluctuations. We find that on balance, the increased sales of subject imports would likely be achieved by means of aggressive pricing in the U.S. market, which would result in significant negative effects on domestic prices, just as occurred

45

prior to the imposition of the orders.

Id. at 41-42.

The court upholds the ITC's determination regarding the likely price effects of the cumulated imports because it does not find the ITC's logic unreasonable. See Titanium Metals Corp. v. United States, 155 F. Supp. 2d 750, 756 (CIT 2001). The relationship between "price effect and . . .volume is obvious" as this court noted in Usinor I, Slip Op. 2002-70 at 41. Because the Commission's finding regarding likely volume in its revised volume analysis is supported by substantial evidence, and its conclusions need only be reasonable for this court to uphold them, see Koyo Seiko Co., 36 F.3d at 1570, the court likewise upholds the likely price effects analysis.

**3**
**The Commission's Findings on Likely Impact of Subject Imports Are Supported by Substantial Evidence**

The ITC adopted its findings in the Review Determination that, if the orders were revoked, there would be a sufficient quantity of the subject imports and at prices below that of the domestic product so as to have a significant adverse impact on the domestic industry in a reasonably foreseeable time. During the 1993 determinations, the Commission found that the increasing volume of lower-priced imports had depressed prices and cause U.S. domestic industry to suffer lost market share, reduced capacity utilization, and financial losses; capital expenditure and R&D expenses also declined, particularly during the latter part of the POR, which undermined the industry's ability to compete in the U.S. market. ITC Remand Results at 42. The ITC determined that the imposition of the orders had a "positive effect" on the domestic industry: four years after the imposition of the order, in 1997, the domestic industry's operating

46

profit margin had increased, and capital expenditures and R&D expenses had climbed with the "dramatic decrease" of the subject imports. Id. The ITC uses the current state of the U.S. market to bolster its argument that domestic injury is vulnerable to material injury if the orders are revoked, claiming the volume and price effects of the cumulated subject imports would be detrimental to domestic industry and would likely cause loss of market share. Id. at 43. The ITC says that the production, shipments, sales, and revenue levels of U.S. industry would be adversely affected by the following price and volume declines. Furthermore, the reduction in production, sales, and revenue would affect the U.S. industry's profitability, bear on its ability to raise capital and make capital investments, and cause employment declines. Id.

Having upheld the Commission's position in the Review Determination setting out the domestic industry's weakened condition, in Usinor I, this court stated that the "Commission could reasonably find that significant increases in import volumes coupled with price declines would lead to significant injury." Slip Op. 2002-70 at 42. In Usinor I, however, the court found that the Commission's volume and price effects analyses were insufficiently supported. Here, as the Commission's volume and price effect findings are supported by substantial evidence, the Commission's findings regarding the likely impact of cumulated subject imports is supported by substantial evidence and is in accordance with the law.

Because the Commission's findings concerning likely volume, price effects, and impact on U.S. domestic industry are supported by substantial evidence, the Commission's determination that the revocation of the orders on subject imports of CRCS is likely to lead to the continuation or recurrence of material injury within a reasonably foreseeable time is also supported by substantial evidence and is in accordance with law.

47

**VI**
**CONCLUSION**

For the foregoing reasons the ITC's five-year, sunset review in <u>Certain Carbon Steel</u>

<u>Products From Australia, Belgium, Brazil, Canada, Finland, France, Germany, Japan, Korea,</u>

<u>Mexico, Netherlands, Poland, Romania, Spain, Sweden, Taiwan, and United Kingdom</u>, 65 Fed.

Reg. 75,301 (Dec. 1, 2000) is sustained.

_____/s/ Evan. J. Wallach_____
Judge

Dated: June 9, 2004
      New York, New York